1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                           - - -

4

     IPA TECHNOLOGIES INC.,          :    CIVIL ACTION
5                                     :
                    Plaintiff,        :
6                                     :
        vs.                           :
7                                     :
     AMAZON.COM, INC., and            :
8    AMAZON DIGITAL SERVICES,         :
     LLC,                             :
9                                     :
                    Defendant.   :    NO. 16-1266 (RGA)
10   ---------------------------      :
     IPA TECHNOLOGIES INC.,           :    CIVIL ACTION
11                                    :
                    Plaintiff,        :
12                                    :
        vs.                           :
13                                    :
     SONY ELECTRONICS INC., and       :
14   SONY MOBILE COMMUNICATIONS       :
     (USA) INC.,                      :
15                                    :
                                      :
16                  Defendant.   :    NO. 17-055 (RGA)

17                           - - -

18                              Wilmington, Delaware
                                Thursday, November 16, 2017
19                              3:11 o'clock, p.m.

20                           - - -

21   BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

22                           - - -

23

24
                                Valerie J. Gunning
25                              Official Court Reporter

1    **APPEARANCES:**

2

3              BAYARD, P.A.
               BY:  STEPHEN B. BRAUERMAN, ESQ.
4

5                        -and-

6
               RUSS, AUGUST & KABAT
7              BY:  MARC A. FENSTER, ESQ. and
                    BRIAN LEDAHL, ESQ.
8                   (Los Angeles, California)

9
                        Counsel for Plaintiff
10

11
               ASHBY & GEDDES
12             BY:  ANDREW C. MAYO, ESQ.

13
                        -and-
14

15             FENWICK & WEST LLP
               BY:  J. DAVID HADDEN, ESQ. and
16                  RAVI RANGANATH, ESQ.
                    (Mountain View, California)
17

18                      Counsel for Defendants
                        Amazon.com, Inc. and
19                      Amazon Digital Services, LLC

20

21             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
               BY:  RODGER D. SMITH, ESQ.
22

23                      -and-

24

25

```
 1    APPEARANCES (Continued):

 2
                PAUL HASTINGS LLP
 3              BY:  MICHAEL HENDERSHOT, ESQ. and
                     DAVID OKANO, ESQ.
 4                   (Palo Alto, California)

 5
                     Counsel for Defendants
 6                   Sony Electronics Inc. and
                     Sony Mobile Communications (USA) Inc.
 7

 8                       -  -  -

 9
      ALSO PRESENT:
10
                     Ajeet Pai
11                   Amazon

12                       -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

14:55:25

14:55:45          (Proceedings commenced in the courtroom,

14:55:52   beginning at 3:11 p.m.)

15:02:15

15:02:15          THE COURT:  All right.  Good afternoon,

15:02:16   everyone.  Please be seated.

15:02:17          This is IPA Technologies, Inc. versus

15:02:22   Amazon.com, Civil Action No. 16-1266, and IPA Technologies

15:02:27   versus Sony, Civil Action No. 17-55.

15:02:34          Mr. Brauerman, good afternoon.

15:02:39          MR. BRAUERMAN:  Good afternoon, Your Honor.

15:02:40   Steve Brauerman from Bayard on behalf of the plaintiff, IPA

15:02:45   Technologies, Incorporated.

15:02:46          I'm joined at counsel table by Marc Fenster and

15:02:50   Brian Ledahl of Russ, August & Kabat in Los Angeles, and

15:02:53   with your Honor's permission, Mr. Fenster will address the

15:02:57   Court today.

15:02:57          THE COURT:  That will be fine.  Mr. Fenster is

15:02:59   pretty well-known here.  Mr. Smith or Mr. Balick, they're

15:03:03   pretty well-known, too.

15:03:04          MR. SMITH:  Good afternoon, Your Honor.

15:03:05   Rodger Smith from Morris Nichols on behalf of the Sony

15:03:05   defendants.

15:03:05          I am joined by Michael Hendershot from Paul

| | | |
|---|---|---|
| 15:03:08 | 1 | Hastings and his colleague David Okano, also from Paul |
| 15:03:13 | 2 | Hastings. |
| 15:03:14 | 3 | THE COURT:  Okay.  Thank you. |
| 15:03:15 | 4 | MR. SMITH:  Thank you. |
| 15:03:16 | 5 | THE COURT:  Thank you.  Mr. Balick? |
| 15:03:17 | 6 | MR. BALICK:  Hello, your Honor. |
| 15:03:18 | 7 | THE COURT:  Good afternoon. |
| 15:03:19 | 8 | MR. BALICK:  Good afternoon.  Steven Balick from |
| 15:03:21 | 9 | Ashby & Geddes here on behalf of Amazon. |
| 15:03:23 | 10 | I'm joined by co-counsel from Fenwick & West, |
| 15:03:25 | 11 | David Hadden. |
| 15:03:25 | 12 | MR. HADDEN:  Good afternoon, Your Honor. |
| 15:03:27 | 13 | MR. BALICK:  And Rovi Ranganath.  And our client |
| 15:03:30 | 14 | is with us as well today.  Ajeet Pai from Amazon is in the |
| 15:03:34 | 15 | back of the courtroom. |
| 15:03:36 | 16 | THE COURT:  Okay. |
| 15:03:37 | 17 | MR. BALICK:  Thank you. |
| 15:03:38 | 18 | THE COURT:  Thank you. |
| 15:03:38 | 19 | And let me think.  I recall I think Amazon wrote |
| 15:03:44 | 20 | the first brief and then Sony wrote the second.  Do I have |
| 15:03:51 | 21 | the order right? |
| 15:03:51 | 22 | MR. HADDEN:  Yes, your Honor. |
| 15:03:52 | 23 | THE COURT:  And so in terms of the defendants' |
| 15:03:54 | 24 | side of the equation here, who is arguing what? |
| 15:03:57 | 25 | MR. HADDEN:  Sure, your Honor.  David Hadden for |

15:04:02  1    Amazon.

15:04:03  2              We'll go first and focus on step 1 mostly of the

15:04:05  3    Alice test and Mr. Hendershot will follow me.

15:04:13  4              THE COURT:  All right.  Does that mean he's

15:04:15  5    going to focus on step 2?

15:04:19  6              MR. HENDERSHOT:  Yes, Your Honor.  I'm not going

15:04:20  7    to retread ground covered by Mr. Hadden.  I am going to

15:04:21  8    focus primarily on the positions and the specifications that

15:04:23  9    relevant to the question.

15:04:23  10             THE COURT:  Okay.  Go ahead, Mr. Hadden.

15:04:27  11             MR. HADDEN:  Thank you, Your Honor.

15:04:35  12             So as you know, Your Honor, the three patents in

15:04:38  13   this case share common specifications, and all claim

15:04:41  14   priority to the same initial application.  All of the

15:04:45  15   patents --

15:04:46  16             THE COURT:  Remind me.  That is what date,

15:04:48  17   approximately?

15:04:48  18             MR. HADDEN:  1999, Your Honor.

15:04:50  19             THE COURT:  Okay.

15:04:50  20             MR. HADDEN:  And all of the patents and the

15:04:55  21   claims in this case are invalid because they claim a result,

15:04:57  22   not a specific function, or not a specific solution to

15:05:03  23   achieve that result.

15:05:03  24             THE COURT:  And is this argument about the

15:05:08  25   hundreds of claims that are in here or are there, as the

15:05:13   1   plaintiff indicated, some claims are asserted and not

15:05:16   2   others?

15:05:16   3               MR. HADDEN:  So the plaintiff has identified

15:05:19   4   asserted claims in each of the patents, and basically claim

15:05:23   5   1 from each of the patents.  There has been no, nothing in

15:05:26   6   the briefing that has raised additional limitations for

15:05:30   7   dependents claims, as they've been called out.  So I think

15:05:33   8   it's effectively undisputed that those claims are

15:05:38   9   represented.

15:05:38   10              Before I go further, I do have some books here

15:05:42   11   that I could hand up.

15:05:43   12              THE COURT:  Yes.

15:05:44   13              MR. HADDEN:  If you would like them.

15:05:46   14              THE COURT:  Yes, please.

15:05:46   15               (Mr. Hadden handed slides to the Court.)

15:05:53   16              MR. HADDEN:  The problem with these claims is

15:05:55   17   the same problem that the Federal Circuit found with the

15:05:57   18   claims in Infinity Labs, which is they do no more than

15:06:02   19   describe a function or an outcome without providing any

15:06:07   20   limiting detail to a particular solution to that problem.

15:06:11   21   And that is a vague issue here, because the problem is a

15:06:14   22   huge one.  It is sort of one of the holy grails of computer

15:06:18   23   science, which is understanding and responding to spoken

15:06:21   24   natural language.  That is something that has been intense

15:06:25   25   study of computer scientists for decades, both in industry

| | |
|---|---|
| 15:06:30 | 1 |

and academia, and it has begun to bear fruit in the last

several years with very useful consumers products like

Amazon's Alexa and Apple's Siri that now allow millions of

people to get information and entertainment by asking for

it.

But there's nothing in these claims that

describe a particular way for that to work.  There is no new

natural language processing technology claimed.  There is no

new speech recognition technology claimed.  All the patents

claim is the idea itself that such an interaction would be

useful, and that's not enough.

As the Federal Circuit told us repeatedly up

until two weeks ago in the Two-Way Media case, that as a 101

analysis, we have to focus on the claims to see whether

they're actually directed to a specific solution or just a

result, which is nothing but the idea itself, which is the

case here.  And the Federal Circuit in Two-Way Media found

the same thing that we asked here.  Result-based functional

claim language, that it does not sufficiently describe how

to achieve the results in a non-abstract way.

And the Federal Circuit reminded us that the

focus has to be on the claims themselves.  The claims

themselves have to include that required specific technical

solution, and the claims here don't.  All right.

The idea, or the recognition that it would be

15:07:59   1   cool to get information by talking to a computer, or to get

15:08:03   2   the movie you want by asking your remote, all of these

15:08:10   3   patents claim.  And there's an example in the patent, this

15:08:14   4   video on demand application.

15:08:16   5           THE COURT:  Oh, yes.  Clint Eastwood.

15:08:18   6           MR. HADDEN:  Right.  When the user wants to see

15:08:20   7   a Clint Eastwood movie, he wants to see Unforgiven, but

15:08:24   8   doesn't remember the name, so he asks for movies that are

15:08:26   9   directed and starring Clint Eastwood.

15:08:29   10          And the way the patent explains that it works

15:08:32   11  is, you say, I want to see that movie storing and directed

15:08:36   12  by Clint Eastwood.  I don't remember the title.  You talk

15:08:39   13  into your remote control, and somehow you get back a list of

15:08:43   14  movies that are starring and directed by Clint Eastwood.

15:08:47   15  Unforgiven, True Crime.  It's an old patent.  It doesn't

15:08:52   16  have Million Dollar Baby and several others.  But there's no

15:08:56   17  description of how these results are obtained.  There is no

15:08:56   18  description of how what you've said is understood by the

15:08:56   19  computer system, and there is no description of how an

15:09:01   20  appropriate data source is somehow queried to find the

15:09:12   21  results.

15:09:12   22          The next step in the idea here is that you get

15:09:14   23  back a list of movies, and then you can pick Unforgiven

15:09:19   24  from that list by clicking 1 on your remote control.  That

15:09:22   25  is the multimodal input that we heard much about in IPA's

15:09:29   1   brief.

15:09:29   2            But just picking from a list after you have

15:09:32   3   gotten a subset of what you ask for, that is just an

15:09:36   4   abstract idea.  That is not technology.  There's no

15:09:40   5   description in these claims of any piece that would give you

15:09:44   6   any part of this interaction.  The claim is just the idea of

15:09:47   7   the interaction itself.

15:09:49   8            And if we look at the claims, that is clear.  So

15:09:54   9   here's claim 1 from the '021 patent, which is one of the

15:09:57  10   asserted claims.

15:09:58  11            The preamble just talked about speech-based

15:10:01  12   navigation using network servers.  Clearly, having network

15:10:05  13   servers is nothing innovative or original.

15:10:08  14            The first element is just receiving the request.

15:10:11  15   I want to see a Clint Eastwood movie.

15:10:14  16            In response to that, the next step is rendering

15:10:17  17   an interpretation of the spoken request.  And this is where

15:10:20  18   the real land grab is in this case.  Right?  That is the

15:10:24  19   very hard problem that people have been trying to solve for

15:10:28  20   decades and this claims the result.  You render the

15:10:31  21   interpretation.  You determine the meaning.  There is no

15:10:36  22   explanation here --

15:10:37  23            THE COURT:  But I thought that by the time this

15:10:40  24   was written, there were already commercial programs that

15:10:45  25   could render interpretation of the spoken request.  This is

15:10:50    1    **why there's no further description of this that's probably**

15:10:55    2    **necessary.**

15:10:55    3            **MR. HADDEN:  Well, there was certainly voice**

15:10:59    4    **recognition software and there were some programs that would**

15:11:02    5    **interpret the natural language to words that came out of**

15:11:05    6    **that.  But doing that in a way that is actually useful, like**

15:11:09    7    **with Amazon's Alexa or Apple's Siri, it was a very hard**

15:11:14    8    **problem.**

15:11:14    9            **THE COURT:  Well, right, but they're not**

15:11:16    10    **actually -- the patent is not actually claiming Alexa.  It**

15:11:19    11    **is claiming something else.**

15:11:21    12            **MR. HADDEN:  Well, they have sued Amazon based**

15:11:23    13    **on Alexa.**

15:11:24    14            **THE COURT:  Well, no.  I'm not saying they don't**

15:11:27    15    **say Alexa reads on it.**

15:11:28    16            **MR. HADDEN:  Sure.**

15:11:29    17            **THE COURT:  But they're not -- and so maybe**

15:11:31    18    **that's inconsistent.  But I mean as I understand it, they're**

15:11:41    19    **saying the improvement here has nothing to do with, at least**

15:11:49    20    **the first two steps.**

15:11:51    21            **MR. HADDEN:  I agree completely, Your Honor,**

15:11:53    22    **that there is nothing in the patent that provides an**

15:11:56    23    **improvement to the way that a computer would understand**

15:11:59    24    **spoken language.  The problem I have is that they have a**

15:12:02    25    **claim that says, understands spoken language, and they're**

15:12:06   1   trying to apply it to any system that does that without

15:12:10   2   having provided a better or improved way to do it.

15:12:13   3            THE COURT:  Well, it seems like the question of

15:12:15   4   whether they do or they don't, that's in the five terms or

15:12:21   5   five limitations that follow; right?  And I understand your

15:12:25   6   position is that they don't, but I think that's where you

15:12:29   7   need, where we need to concentrate.

15:12:33   8            Do you agree?

15:12:34   9            MR. HADDEN:  Well, I agree in part, Your Honor.

15:12:36   10  I agree that we need to look at the next five terms, but all

15:12:41   11  of those five terms use what is the output of step 1.

15:12:46   12  Right.  The meaning of what was spoken.  Right.

15:12:49   13           So they're not saying there's any better way

15:12:51   14  here of understanding what was said.  You just understand

15:12:54   15  what was said.  Right.  And then you do some other things,

15:12:58   16  like provide the list of movies, and we can walk through

15:13:01   17  those.

15:13:01   18           So in essence, every one of these claims is a

15:13:06   19  subset of every way to determine what was said, and that is

15:13:10   20  a huge grab where there's no technology for doing that

15:13:14   21  that's described or claimed.

15:13:17   22           So if we look and see what actually else happens

15:13:21   23  here, right, the next step is just constructing this

15:13:24   24  navigation query based on the interpretation.  So that's

15:13:28   25  just somehow creating a query that is going to get me

15:13:32    1   Unforgiven, Absolute Power, I forgot what the third Clint

15:13:37    2   Eastwood movie is, but whatever it is that I asked for in my

15:13:40    3   original question.  All right.  And there's no description

15:13:42    4   here of how you construct that query, how you take the

15:13:48    5   meaning of what was said and turn it into some sort of query

15:13:51    6   or some sort of data search.

15:13:53    7          And then the next step is the listing of the

15:13:58    8   three options.  Right.  It's the listing additional input

15:14:01    9   from the user.  But there's no description here of

15:14:06   10   determining when additional input would be required.  Right.

15:14:10   11   There's no way of determining in this claim what initial

15:14:14   12   spoken request was ambiguous or needed clarification.

15:14:19   13   There's no description of doing that or how you would do

15:14:21   14   that here.  All this says is you provide some options that

15:14:26   15   someone can respond to with no way of figuring out what

15:14:30   16   those options would be or why you would need them.

15:14:33   17          And then the next step is just using whatever

15:14:37   18   additional information you got from the user to somehow come

15:14:41   19   up with a query that is more tailored to what they want, but

15:14:45   20   there's no way, there's no description of how you would do

15:14:48   21   that.

15:14:50   22          And, finally, there's just using this query that

15:14:54   23   you get at the end of the day and get whatever it is the

15:14:56   24   user wants from any electronic data source, and you transmit

15:15:00   25   it back to them.

15:15:02   1        So at the end, all this claim does is describe

15:15:06   2   the steps we saw in the Clint Eastwood example, with no

15:15:09   3   description of any technology for actually making any of

15:15:13   4   that transaction work.  It's just the idea of the

15:15:17   5   transaction itself.

15:15:19   6        And if we look at the proposed claim

15:15:23   7   constructions that IPA provided in response to Your Honor's

15:15:26   8   request, it's clear that they don't provide any more of a

15:15:31   9   concrete solution to the claim.  All right.

15:15:34   10        THE COURT:  Well, I didn't think they really

15:15:37   11   caused much narrowing or something else that -- you know,

15:15:48   12   sometimes you do this to see whether there's some sort of

15:15:51   13   generic term that the claim construction is more specific,

15:15:57   14   so I didn't think the claim construction, at least it wasn't

15:16:02   15   obvious to me that it made any difference.

15:16:03   16        MR. HADDEN:  I think, in fact, Your Honor, the

15:16:06   17   claim construction designated is more result and function

15:16:10   18   oriented than the claim itself.  All right.

15:16:12   19        So electronic data source is basically any sorts

15:16:15   20   of digital information.  Rendering an interpretation of the

15:16:21   21   spoken request is again any means existing or in the future

15:16:26   22   for determining the meaning of a spoken request using a

15:16:30   23   computer.  That's the big hard problem that people are

15:16:33   24   working hard to do better and better every day.

15:16:36   25        And then navigation query is basically anything

| | | |
|---|---|---|
| 15:16:40 | 1 | that is appropriate to search the desired information.  I |
| 15:16:44 | 2 | mean, that is just the final result.  Right?  Whatever |
| 15:16:50 | 3 | information to get you the information you want is a |
| 15:16:51 | 4 | navigation query under the construction. |
| 15:16:53 | 5 | So I think, if anything, the constructions just |
| 15:16:56 | 6 | show that this is a purely result oriented functional claim |
| 15:17:00 | 7 | that basically covers any interactions with a computer that |
| 15:17:05 | 8 | will get you the information you want with some step in |
| 15:17:08 | 9 | between where you clarify in some undetermined manner. |
| 15:17:13 | 10 | Now, if we look at, you know, where is the real |
| 15:17:16 | 11 | required specific technical solution, well, IPA has pointed |
| 15:17:22 | 12 | us to one in their brief.  They say, the asserted claims are |
| 15:17:25 | 13 | directed to technological solutions specific to navigating |
| 15:17:29 | 14 | electronic data sources.  But we just saw, their |
| 15:17:31 | 15 | construction of electronic data sources is any sort of |
| 15:17:35 | 16 | digital information.  That is not a specific field to start |
| 15:17:39 | 17 | with.  And what's required is not applying the abstract idea |
| 15:17:44 | 18 | to some specific field of use.  What is required is a |
| 15:17:47 | 19 | specific technical solution that would get you the result, |
| 15:17:52 | 20 | and that's not here. |
| 15:17:53 | 21 | They talk about the use of structured navigation |
| 15:17:57 | 22 | queries, but, again, their own construction of that is |
| 15:18:00 | 23 | anything that will get you the information you want from any |
| 15:18:03 | 24 | electronic source.  That is not a technical solution. |
| 15:18:07 | 25 | That's a result.  A black box. |

15:18:08    1        They talk about quickly and efficiently

15:18:11    2    navigating increasingly large and complex electronic

15:18:14    3    databases, but there's nothing in that claim that we saw

15:18:18    4    that does anything to help you navigate a large complex

15:18:22    5    database.  Right.  Sure, asking for something and getting it

15:18:26    6    back out of a complex database would be a great thing, but

15:18:30    7    there's no solution in that claim for doing it.

15:18:33    8        And, finally, they talk about resolving errors

15:18:36    9    and ambiguities and it's the same issue.  Yes, it's great to

15:18:40   10    have a system that resolves the errors and ambiguities, but

15:18:43   11    there's nothing in the claim that even identifies an

15:18:46   12    ambiguity or provides a way to resolve it.  Right.  All they

15:18:50   13    say is, the user can provide more information, but that

15:18:54   14    doesn't tell you how to do anything.

15:18:56   15        At the end of the day, the claim as basically

15:19:02   16    illustrated in the specification is a series of black boxes

15:19:06   17    and they're all in it.  Right.  You have some speech

15:19:08   18    recognition.  You have some natural language parser, and

15:19:13   19    then you have a way to construct queries and refine them.

15:19:16   20    But these boxes are completely empty in the claim.  There

15:19:19   21    is no technology for doing any of these.  They're just

15:19:22   22    results.

15:19:26   23        Now, they tried to, you know, wrap themselves in

15:19:31   24    Enfish and some of the other Federal Circuit cases that have

15:19:33   25    held claims, but those claims had a specific solution.

15:19:38    1    Right.   Enfish you have the self-referential database and

15:19:42    2    the four-step limit.   Bascom, you had a new approach to

15:19:46    3    using the IP address to custom filter Internet content in an

15:19:53    4    ISP.

15:19:54    5                There's nothing comparable to those solutions

15:19:56    6    in these claims.   It is just, ask for what you want from a

15:20:01    7    computer, provide some followup, and get it.

15:20:03    8                And there's a lot of, you know, claiming that

15:20:09    9    somehow this is the technology that enabled Siri and the

15:20:13   10    timeline couldn't be clearer that that is nonsense.   This

15:20:16   11    patent was filed in 1999.

15:20:18   12                The folks who invented Siri as well as hundreds

15:20:21   13    of artificial intelligence researchers who worked on the

15:20:25   14    CALO project --

15:20:27   15                THE COURT:   What you are talking about now,

15:20:30   16    which, you know, I did see some back and forth in the brief,

15:20:36   17    given the procedural posture of this case, it may be

15:20:42   18    well-known to you all, some of this stuff, but it's not

15:20:46   19    well-known to me.

15:20:51   20                Shouldn't I just ignore this part in terms of

15:20:53   21    what I have to do here?

15:20:54   22                MR. HADDEN:   I don't think you have to, Your

15:20:57   23    Honor, in fact, because it's in their pleading.   They plead

15:21:00   24    the release dates of Siri.   We know the filing date.   If you

15:21:04   25    want to skip the CALO in between, they acknowledge those

| | | |
|---|---|---|
| 15:21:07 | 1 | dates are correct in their opposition to Sony's brief. |
| 15:21:11 | 2 | There's no real dispute. |
| 15:21:12 | 3 | But I think the point is clear that the problem |
| 15:21:14 | 4 | with this patent and patents like it is, they're trying to |
| 15:21:18 | 5 | claim the decade of innovation that led to the actual |
| 15:21:23 | 6 | product.  Right.  And there's a corresponding decade of |
| 15:21:27 | 7 | innovation by Amazon that led to Alexa and Google that led |
| 15:21:31 | 8 | to Google Voice.  And you can't jump to the finish line and |
| 15:21:35 | 9 | grab the results of that innovation and real invention based |
| 15:21:38 | 10 | on this empty patent from '99. |
| 15:21:41 | 11 | THE COURT:  So what you are just saying now, if |
| 15:21:48 | 12 | the case goes forward, is that some combination of a written |
| 15:21:52 | 13 | description or enablement defense? |
| 15:21:55 | 14 | MR. HADDEN:  Well, I think there is definitely |
| 15:22:00 | 15 | both a written description and enablement issue, but the |
| 15:22:03 | 16 | issue I'm going at more is the preemption issue.  Right. |
| 15:22:07 | 17 | That underlying rationale or one of them under 101 is that |
| 15:22:11 | 18 | you don't get a claim that you solved a problem and then |
| 15:22:17 | 19 | claim everybody else's future solutions.  All right.  I |
| 15:22:21 | 20 | mean, it's like Judge Bryson said in Affinity Labs.  Right. |
| 15:22:26 | 21 | You can't just write down a problem, check I solved it, and |
| 15:22:29 | 22 | then preempt all the development that goes into real |
| 15:22:33 | 23 | solution, which is what they're doing here.  Right. |
| 15:22:38 | 24 | We saw the claim.  There's no claim that a |
| 15:22:40 | 25 | specific way to do anything exists.  People spend decades |

15:22:43    1    and hundreds of millions of dollars developing ways that

15:22:47    2    actually work well, and these folks are trying to claim

15:22:50    3    them.

15:22:51    4                THE COURT:  And I'm sorry.  The case you were

15:22:53    5    citing with Judge Bryson --

15:22:56    6                MR. HADDEN:  Affinity Labs versus Amazon, Your

15:22:59    7    Honor.

15:22:59    8                THE COURT:  Was that a District Court or --

15:23:00    9                MR. HADDEN:  He said essentially the same thing

15:23:02   10    in a prior District Court opinion, but that is a Federal

15:23:06   11    Circuit opinion, Your Honor.

15:23:06   12                THE COURT:  Okay.  All right.

15:23:07   13                MR. HADDEN:  And that's the problem with these

15:23:13   14    types of patents, and I think that's the clearest kind of

15:23:17   15    101 issue, which is that the difference between claiming a

15:23:20   16    technical solution, which you have a right to, and just

15:23:24   17    claiming a problem and the notion that you could solve it,

15:23:29   18    which is all we have here.

15:23:31   19                They tried to distinguish cases like Affinity

15:23:36   20    Labs versus Amazon and there's just no way to do it.  So

15:23:42   21    this is the representative claim from that case.  It is like

15:23:44   22    the claim here in that it is aspirational.  Right.  It is

15:23:48   23    basically claiming the idea that it would be cool to

15:23:52   24    download music or video to my wireless device without

15:23:57   25    providing any real technology for doing it.  But it

15:24:01  1   certainly provides the level of kind of description that's

15:24:04  2   in the claims here or more.  It talks about streaming video

15:24:10  3   using some network based resources and a list of network

15:24:14  4   locations.  That is more specific than the claims here,

15:24:17  5   which talk about getting any type of information from any

15:24:21  6   digital source in any manner.

15:24:23  7            THE COURT:  Was Affinity Labs -- I have to say

15:24:26  8   notwithstanding the fact that I try to read these cases, not

15:24:31  9   one that I can draw any picture of.  Was that a motion to

15:24:34  10  dismiss or a summary judgment?

15:24:36  11            MR. HADDEN:  It was a motion to dismiss.  I

15:24:38  12  actually argued this one.  It was a motion to dismiss, Your

15:24:41  13  Honor.

15:24:41  14            THE COURT:  Okay.  Right.  All right.

15:24:48  15            MR. HADDEN:  And the other case that I think is

15:24:50  16  just, there's not a universe where the Electric Power Group

15:24:55  17  claim is invalid and this claim is valid.  Right.

15:24:59  18            Electric Power Group, the claim has a lot of

15:25:02  19  detail in describing what data is received, specific time

15:25:07  20  limits on it, how it is analyzed, how it is compiled and

15:25:13  21  accumulated, and how it is used to develop these indicators

15:25:17  22  of reliability.  If this claim is fatally abstract, I don't

15:25:24  23  see how the claims in these IPA patents could possibly

15:25:28  24  survive.

15:25:33  25            One last point, Your Honor.  In a footnote in

| | | |
|---|---|---|
| 15:25:35 | 1 | IPA's opposition, they point to the word "agents" in some of |
| 15:25:40 | 2 | the claims of the '061 patent as being relevant.  I think |
| 15:25:44 | 3 | tellingly, Your Honor, IPA did not provide a construction |
| 15:25:48 | 4 | for agent, and did not include it on the list of terms that |
| 15:25:53 | 5 | were somehow relevant to this motion, so I don't think it |
| 15:25:56 | 6 | is. |
| 15:25:56 | 7 | If you look at how it's actually used in the |
| 15:25:59 | 8 | claim, it's just another name for the black box that |
| 15:26:02 | 9 | performs some of these functions, like utilizing the |
| 15:26:07 | 10 | navigation query to select electronic data.  It doesn't tell |
| 15:26:11 | 11 | you anything about what the agent does to make that happen. |
| 15:26:17 | 12 | And, in fact, in the patent that is incorporated by |
| 15:26:20 | 13 | reference, it talks about agent, there's no dispute that |
| 15:26:24 | 14 | there's not something that IPA invented.  Right.  It talks |
| 15:26:28 | 15 | about agent as being a known prior art way of creating |
| 15:26:35 | 16 | distributed software.  It's like object oriented programming |
| 15:26:39 | 17 | on steroids. |
| 15:26:40 | 18 | THE COURT:  All right.  You're using words that |
| 15:26:43 | 19 | don't necessarily mean anything to me. |
| 15:26:44 | 20 | MR. HADDEN:  Sorry, Your Honor. |
| 15:26:45 | 21 | THE COURT:  Can you -- |
| 15:26:50 | 22 | MR. HADDEN:  Yes. |
| 15:26:51 | 23 | THE COURT:  -- explain this -- |
| 15:26:52 | 24 | MR. HADDEN:  My only point, Your Honor -- my |
| 15:26:56 | 25 | only point. |

15:26:56    1          If we go back to the claim, sorry, they have

15:27:01    2    some claims that talk about agents during X, Y and Z.  They

15:27:06    3    don't tell you anything about how the agents do it, so all

15:27:09    4    this is is just another name for some black box that

15:27:13    5    performs this function and achieves whatever this result is.

15:27:18    6    Querying the data source, for example.

15:27:20    7          THE COURT:  And just on a basic level, you

15:27:24    8    think agents, you would interpret it as being things, not

15:27:28    9    people?

15:27:29    10          MR. HADDEN:  Right.  So there is a kind of

15:27:35    11    software development paradigm in which things called agents

15:27:42    12    are used.  They are basically little programs that can

15:27:46    13    coordinate with each other to perform tasks.

15:27:49    14          THE COURT:  All right.

15:27:50    15          MR. HADDEN:  But the basic idea of agents is not

15:27:53    16    an invention, and they acknowledge it's not.

15:27:57    17          THE COURT:  And so in a different context not

15:27:59    18    too long ago, people were talking about macro.  Is that the

15:28:03    19    same idea?

15:28:03    20          MR. HADDEN:  Not exactly, but an agent is kind

15:28:09    21    of like -- it is, the patent actually describes it as a

15:28:15    22    wrapper around an application, so you have some program that

15:28:19    23    does something, and then you want it to be able to work with

15:28:23    24    another program that does something else to try to solve

15:28:26    25    basically a bigger problem.  To do that, you can provide

15:28:30  1    some additional capabilities that would allow those two

15:28:34  2    different programs to exchange information.  In that sense,

15:28:38  3    they kind of become agents.

15:28:40  4              But it was kind of faddish, it's kind of gone

15:28:46  5    now, but for a while was a well-known programming

15:28:49  6    methodology, a derivative of object oriented programming,

15:28:53  7    which is kind of another standard programming methodology

15:28:56  8    for building big applications.  But just, my point is just

15:29:01  9    invoking the word "agent" does not tell you anything about

15:29:05  10   how it works and it's not a new idea.

15:29:08  11             THE COURT:  Okay.

15:29:10  12             MR. HADDEN:  If you have no more questions for

15:29:12  13   me, I will turn it over to my colleague for Sony, Your

15:29:15  14   Honor.

15:29:15  15             THE COURT:  All right.  That will be good.

15:29:17  16             MR. HADDEN:  Thank you.

15:29:29  17             MR. HENDERSHOT:  May it please the Court,

15:29:30  18   Michael Hendershot of Paul Hastings on behalf of the Sony

15:29:34  19   defendants.

15:29:35  20             I have some slides as well.  If I can approach?

15:29:37  21             THE COURT:  Okay.

15:29:38  22             (Mr. Hendershot handed slides to the Court.)

15:29:43  23             MR. HENDERSHOT:  This one is a shorter one.

15:29:45  24             THE COURT:  Good enough.

15:29:58  25             MR. HENDERSHOT:  So if I could just pick up on a

15:30:02    1    few items Your Honor was discussing with co-counsel.

15:30:04    2    Specifically with regard to agent, if you could pull up

15:30:06    3    slide 16, or slide 11, please.

15:30:13    4            There was some discussion about what software

15:30:16    5    agents were and it is generally accurate.  The specification

15:30:22    6    talks about them by reference to establish technology and

15:30:25    7    what was commonly known at the time.

15:30:26    8            I think what you primarily need to know about

15:30:27    9    agents in connection with this motion are two things.  One,

15:30:30   10    they didn't offer construction of them suggesting that they

15:30:34   11    would be anything other than a direct software concept.

15:30:38   12    And, two, in their opposition, IPA's opposition to Sony's

15:30:43   13    notion, they noted that Sony said certain claim elements

15:30:46   14    such as agents and facilitators, which are also in the '061

15:30:50   15    claims, were known or conventional.

15:30:51   16            And then IP explains, the patents do not claim

15:30:54   17    that these elements are inventive, nor do they claim to

15:30:57   18    improve upon the OAA, which I may touch upon, which was a

15:31:02   19    software application that was known and available that used

15:31:04   20    both agents and facilitators.

15:31:06   21            So there's no argument I'm hearing from the

15:31:07   22    other side that those are transformative or inventive.

15:31:10   23            With respect to Your Honor's question about

15:31:16   24    Siri, and there's discussion about subsequent development.

15:31:19   25    From the date of the application for these patents, there

| | | |
|---|---|---|
| 15:31:23 | 1 | absolutely was a decade, probably coming up on two decades |
| 15:31:27 | 2 | now of R&D and research and innovation to develop a robust |
| 15:31:31 | 3 | commercial product that a consumer can use reliably, dual |
| 15:31:36 | 4 | voice assistant, Siri, Alexa, the things some of us use |
| 15:31:41 | 5 | today, but at the level these functions are claimed, |
| 15:31:45 | 6 | transmitting of information, interpreting.  In 1999, those |
| 15:31:51 | 7 | ideas were established.  Those were conventional.  It was a |
| 15:31:53 | 8 | robust field of art that the specification itself points to |
| 15:31:58 | 9 | about what was known. |
| 15:31:59 | 10 | So the idea, the idea of performing the |
| 15:32:03 | 11 | functions at the level they're recited in these claims may |
| 15:32:06 | 12 | have taken additional time to develop a really successful |
| 15:32:09 | 13 | commercial product, but at the level they're claimed was |
| 15:32:14 | 14 | absolutely known and established conventional at the time of |
| 15:32:17 | 15 | the invention. |
| 15:32:19 | 16 | And Your Honor raised a question about |
| 15:32:22 | 17 | representative claims.  I can touch on that briefly.  Both |
| 15:32:26 | 18 | Amazon and Sony identified what they believed were |
| 15:32:29 | 19 | representative claims in their motion.  They matched up to |
| 15:32:32 | 20 | the claims identified in the complaints and opposition.  I |
| 15:32:36 | 21 | don't think representativeness was contested. |
| 15:32:39 | 22 | There are a number of claims in one of the |
| 15:32:40 | 23 | patents, but I don't think really could argue that they're |
| 15:32:43 | 24 | not fairly represented by the claims we've briefed. |
| 15:32:45 | 25 | THE COURT:  And which do you -- wait a second. |

15:32:52   1   Yes, okay.  Never mind.

15:32:54   2            MR. HENDERSHOT:  Just a few examples.  The '021

15:32:59   3   patent has six sets of independent claims, substantially

15:33:03   4   identical dependent claims.  So there are a series of

15:33:06   5   repeating claims.  There are six dedicated to using a

15:33:10   6   database language.  There are six dedicated to processing

15:33:13   7   locally.  Six dedicated to processing remotely.  16, to

15:33:18   8   display items on a menu when selecting them.  I don't think

15:33:21   9   there's a fair argument that the claims we've identified

15:33:23  10   aren't representative and I don't think they've raised one

15:33:25  11   in their briefing.

15:33:27  12            So I don't want to retread ground that

15:33:34  13   co-counsel covered -- slide 2, please.  I want to touch, I

15:33:38  14   think the claims control.  That's clear from the Federal

15:33:41  15   Circuit.

15:33:41  16            I think it's clear if you look at the claims in

15:33:43  17   these patents, they fall right in line with Electric Power

15:33:46  18   Group, TLI, the Affinity case and the Two-Way Media case,

15:33:51  19   and that they claim desired results without any way of

15:33:54  20   achieving those.

15:33:56  21            The specification I think confirms that and

15:33:58  22   gives some reason as to why they're probably claiming them

15:34:00  23   at such a high functional level.  This is a sentence on the

15:34:03  24   slide here from IPA's opposition.  It says, The patents

15:34:08  25   address these needs by providing essentially navigating

15:34:12    1   network based electronic data sources in response to spoken

15:34:16    2   input requests, and the needs that were identified ahead of

15:34:20    3   that included finding, developing a voice driven front end

15:34:23    4   to existing data back ends.

15:34:25    5          Now, that stuck out to me -- go to the next

15:34:28    6   slide.  Because the specification I believe Your Honor was

15:34:32    7   alluding to earlier provides on the voice front end side,

15:34:36    8   there were readily available commercial quality speech

15:34:39    9   recognition engines.  They don't claim to have improved that

15:34:43   10   or modified those.

15:34:44   11          With respect to the back end, the patent is very

15:34:48   12   clear that practitioners of ordinary skill in the art would

15:34:52   13   have been thoroughly familiar with the notion of database

15:34:54   14   navigation through structured query, which is the concept of

15:34:58   15   constructing the database navigation theory that turns up in

15:34:59   16   the claim.

15:34:59   17          So on the front end, there's commercially

15:35:01   18   available stuff, and on the back end, persons of skill in

15:35:04   19   the art would be thoroughly familiar with the technology.

15:35:07   20   And those two concepts in several admissions bear out

15:35:10   21   through all the claims.

15:35:11   22          If we go to the next slide, please.

15:35:13   23          So this is the '718 patent, a method very

15:35:21   24   similar to the '021 claim that counsel talked about.

15:35:24   25          There is a wherein clause in element A that says

15:35:29   1    the appliance is a formal remote control device or a set top

15:35:33   2    box for a television.

15:35:34   3          The specification doesn't offer any particular

15:35:37   4    solution or identify any problem that arises from that

15:35:41   5    context.  That's just a limitation to a technical field,

15:35:44   6    which Alice in subsequent cases has made clear isn't

15:35:47   7    sufficient to take an abstract idea and transport it to

15:35:50   8    something patent eligible.

15:35:53   9          If you look at slide 5, it's a passage from the

15:35:56   10   specification.  It just identifies a set top box, and this

15:36:00   11   television environment as one of any number of different

15:36:04   12   hardware and software computing platforms on which you could

15:36:09   13   implement the invention.  It says you can do it on this

15:36:11   14   platform.  It doesn't offer any particular technical

15:36:12   15   solution or identify any particular technical problems

15:36:15   16   arising in that space.

15:36:16   17          We've cited in Sony's briefing cases that have

15:36:19   18   held a set top box and a remote control aren't sufficient to

15:36:22   19   transform similar claims into patent eligible subject

15:36:25   20   matter, and we think the '718 is no different.

15:36:28   21          Go to the next slide.

15:36:29   22          This is the '021 patent, claim 1, which was

15:36:34   23   discussed.  This is similar to the '718 we just spoke about,

15:36:39   24   except it adds this non-spoken modality and multi-modality

15:36:45   25   input.  I will admit when I read that, it struck me as

15:36:49   1   pretty fancy language.  And I thought, there might be

15:36:53   2   something there multi-modality, non-spoken input.

15:36:58   3           Any time you're interacting with a computer, you

15:37:01   4   are engaging in multi-modality input.  If you use a keyboard

15:37:03   5   and a mouse, those are two forms of --  two modalities of

15:37:06   6   input in the terms of the patent.

15:37:07   7           If you ever had to try to make a reservation on

15:37:09   8   I think United way back in the day, where you get a voice

15:37:12   9   menu and you would speak or hit a number, that's multi-modal

15:37:16   10  input.  Multi-modal input is the most common way to interact

15:37:20   11  with an electronic device.  It's frankly so ubiquitous, I

15:37:25   12  had taken it for granted when I first read the language.

15:37:28   13          If you look at the specification on the next

15:37:30   14  slide, I think it makes really clear that this multi-modal

15:37:34   15  input is not transformative, it's not inventive.  The

15:37:37   16  non-spoken input the patent contemplates is either a menu

15:37:41   17  selection or simply pressing an okay button in response

15:37:45   18  to a return of, results from a spoken search.  That is among

15:37:49   19  the most conventional ways to interact with the device, and

15:37:52   20  the idea that including that in connection with a spoken

15:37:55   21  input device renders it unconventional I think is just

15:37:59   22  contrary to the specification and some additional admissions

15:38:03   23  it makes.

15:38:03   24          The next slide, please.

15:38:07   25          So the specification acknowledges there was a

15:38:12  1    prior art open agent architecture system, or OAA.  That

15:38:17  2    was a known system that was subject to a number of

15:38:19  3    publications well before the earliest priority date for

15:38:21  4    these patents.

15:38:23  5             The patent acknowledges that the OAA was known

15:38:26  6    to provide a useful software platform for building systems

15:38:26  7    that integrate the spoken natural language as well as other

15:38:26  8    user modalities.

15:38:35  9             So the specification is acknowledging that this

15:38:37  10   prior art system that's covered in a number of publications

15:38:40  11   and was known was useful for using multiple modalities.

15:38:45  12             And then in IPA's opposition, which is the

15:38:50  13   second quote, they acknowledge the patents do not claim that

15:38:54  14   these elements are inventive, the elements from the list

15:38:56  15   earlier, nor do the patents claim to invent or improve upon

15:39:03  16   the OAA.  You have an existing conventional software

15:39:04  17   platform that enables you to use natural language and other

15:39:05  18   modes of input, and their brief acknowledges they don't

15:39:08  19   claim to have invented it or improved upon it in here.

15:39:11  20   Again, they are making use of conventional and established

15:39:13  21   technology to implement these high level functions.

15:39:16  22             Go to the next slide.

15:39:17  23             The '061 patent.  It is similar to the '718 and

15:39:24  24   '021 except it doesn't have the multimodal input, it doesn't

15:39:27  25   have the television set top box or remote control.  It has

15:39:33   1   what we've talked about with agents and facilitators.

15:39:36   2                 Can we go to the next slide.

15:39:38   3                 The specification acknowledges in the first

15:39:41   4   quote there that this OAA system, which was publicly known,

15:39:45   5   covered a number of publications, included the agents, the

15:39:49   6   facilitators, everything that was claimed there for those

15:39:52   7   terms we talked about a moment ago.

15:39:54   8                 The specification acknowledges OAA was known as

15:39:58   9   a useful software platform for natural software

15:40:01   10   applications, and it points out a number of prior examples,

15:40:04   11   including the Info Whiz, a unified messaging system and a

15:40:08   12   CommandTalk application.  And this CommandTalk application

15:40:12   13   combine natural language input, non-spoken modalities,

15:40:16   14   agents and facilitators, all in a system where you could

15:40:19   15   respond to a spoken input.  That was from well before the

15:40:23   16   priority date for these patents that was incorporated into

15:40:25   17   the specification, and it's attached as Exhibit A to our

15:40:27   18   motion.

15:40:30   19                 That CommandTalk system demonstrates this order

15:40:32   20   combination and each of these elements they're talking about

15:40:35   21   and trying to claim at a functional level were known,

15:40:38   22   established and conventional.

15:40:43   23                 Go to the next slide.

15:40:44   24                 And we touched on this earlier.  With respect to

15:40:48   25   agents and facilitators, their brief acknowledged they don't

15:40:50    1    contend that they are inventive.

15:40:50    2         I agree with what counsel said about the claim

15:40:55    3    constructions and understand Your Honor's view of them.   I

15:40:58    4    agree with it.   I don't think they added much to render

15:41:00    5    them anything other than claiming a function or desired

15:41:04    6    result.

15:41:05    7         On slide 12, 13 and 14, we've included passages

15:41:12    8    from the specification that confirm these are things that

15:41:14    9    were known and conventional at the time.

15:41:18   10         The navigation query, they talk about it being

15:41:22   11    appropriately structured.   Well, the specification says that

15:41:24   12    means whatever content or structure you need, include.

15:41:28   13    That's not specific.   That doesn't limit it to any

15:41:31   14    technological implementation.

15:41:32   15         With respect to navigation queries, it talks

15:41:35   16    about using SQL or a relationship database, and the patent

15:41:40   17    acknowledges that SQL was both an ANSI and an ISO standard,

15:41:46   18    so it is one of those conventional technologies.

15:41:46   19         Go to the next slide.

15:41:47   20         Electronic data source could basically be

15:41:50   21    anything, a database, a website.

15:41:53   22         Go to the next slide.   And rendering an

15:41:55   23    interpretation of the spoken request.   Again, the patent

15:41:59   24    acknowledges, there are a variety of commercial quality

15:42:02   25    speech recognition products on the product market, including

15:42:06    1    a low-cost shrink-wrapped version.  And it says, basically a

15:42:11    2    speech recognition engine processes acoustic voice data and

15:42:17    3    attempts to generate a text stream of recognized words.

15:42:18    4             That basically maps to the second half of their

15:42:21    5    construction.  The patent again acknowledges those were

15:42:24    6    commercially available and conventional.

15:42:25    7             Next slide.

15:42:26    8             And if you look at their arguments about their

15:42:30    9    constructions, they appear to be arguing that really their

15:42:33   10    invention that they're arguing about or contending they came

15:42:37   11    up with is coming up with a voice input for a computer and

15:42:40   12    that combination at that high of a level.

15:42:43   13             They point to their constructions and argue,

15:42:45   14    look, we tie it to digital data.  We tie it to electronic

15:42:49   15    data.  The first quote says, the improvements are specific

15:42:55   16    to navigating electronic data sources rather than the

15:42:58   17    abstract idea of using speech to obtain any kind of

15:43:00   18    information.

15:43:01   19             The next quote they emphasize, the emphasis of

15:43:04   20    the original, that you're doing electronic data.

15:43:07   21             And the next one says data is numerical, which

15:43:09   22    means it's digital.

15:43:10   23             And the last one, they emphasize that electronic

15:43:14   24    is unpacked.  They emphasize the patent is a computing

15:43:14   25    device.  Additional data, electronic communications and

15:43:21   1   computing device are all as generic computing technology

15:43:24   2   you can find.  This is Alice.  This is taking an abstract

15:43:29   3   idea at a functional level and saying, do it on a computer.

15:43:33   4          Lastly, I want to touch on Bascom a bit because

15:43:35   5   I do think they argue that.  Their position on step 2

15:43:39   6   evolved through their briefing.  They initially said there

15:43:42   7   were questions of fact as to whether individual elements

15:43:44   8   were known or conventional.  Sony submitted its brief

15:43:49   9   mapping each claim element to admissions in the

15:43:52  10   specification establishing that they were both known and

15:43:54  11   conventional.

15:43:54  12          They came back in response to Sony's brief and

15:43:57  13   said, some of the quotes you see earlier, well, even if

15:43:59  14   their individual elements are known and conventional, it's

15:44:02  15   really the combination.  We're like Bascom.  We have an

15:44:06  16   combination of conventional elements.

15:44:07  17          If you pull up the '718, claim 1.  The order in

15:44:15  18   which they are claiming these functions is as conventional

15:44:19  19   as you can get.  There's really not another way to process a

15:44:22  20   spoken request outside of this ordered combination here.

15:44:25  21   You receive an input.  You interpret it.  You search for

15:44:28  22   information based on the interpretation and you return the

15:44:30  23   information that was found based on that search.  There is

15:44:33  24   not another way to sequence that and have a functioning

15:44:35  25   process.  So that's the most conventional ordering you could

15:44:39  1    have.

15:44:39  2             And if you look at the CommandTalk application

15:44:42  3    and a discussion of the publications generally in the

15:44:44  4    specification establish that these combinations of language

15:44:49  5    processing, multimodal input, agents and facilitators had

15:44:55  6    already been established as combinations in a number of

15:44:58  7    prior publications and were known in the field.  And the

15:45:01  8    CommandTalk application in particular, again, that's Exhibit

15:45:04  9    A to Sony's brief, synthesized and details all of that, so

15:45:08  10   their combinations that they're trying to claim here at a

15:45:12  11   very functional level was established and understood and

15:45:14  12   among the most conventional ordered combinations you could

15:45:17  13   come up with.

15:45:18  14             I'm happy to answer any questions the Court has.

15:45:21  15             THE COURT:  No.  I will hear from the other

15:45:23  16   side.

15:45:40  17             MR. FENSTER:  Your Honor, may I hand up a couple

15:45:42  18   copies?

15:45:42  19             THE COURT:  Sure.

15:45:48  20             MR. FENSTER:  Is three sufficient?

15:45:49  21             THE COURT:  Sure.  Yes.

15:45:50  22             (Mr. Fenster handed slides to the Court.)

15:46:24  23             THE COURT:  So, Mr. Fenster, before you get

15:46:26  24   going, just sort of on the preliminary, in terms of claims

15:46:30  25   being asserted or representative claims, could you just

15:46:33    1    address what your view on that is?

15:46:37    2           MR. FENSTER:  Yes, Your Honor.  The claim 1 of

15:46:42    3    each of the asserted patents in our view is not

15:46:45    4    representative of all of the claims.  There are some claims

15:46:48    5    that are representative of each other.  We have not yet

15:46:52    6    identified infringement contentions in those claims that are

15:46:56    7    asserted here.  I will run through for you in my

15:46:59    8    presentation those claims that I believe are representative.

15:47:04    9    There are a number of them.

15:47:05   10           Claim 1 is not representative of all and I will

15:47:08   11    go through and explain why.

15:47:10   12           THE COURT:  Okay.  Good.

15:47:11   13           MR. FENSTER:  Okay.  First, big picture.  Your

15:47:25   14    Honor, 101 has gotten hard.  It is not meant to be a proxy

15:47:34   15    for all of the conditions of validity.  It is not a proxy

15:47:39   16    for obviousness.  It is not a proxy for novelty, and it is

15:47:43   17    not a proxy for enablement or written description.  It is

15:47:49   18    very narrow and specific to identify those patents that are

15:47:55   19    directed to in step 1 a fundamental truth, mathematical

15:48:02   20    algorithym or abstract idea.

15:48:05   21           The inquiry of step 1 is what the claims are

15:48:11   22    directed to.  Is their focus only the abstract idea, or is

15:48:18   23    it something more?

15:48:20   24           So let's go to slide 5.  These are the

15:48:24   25    ineligible ideas that can't be claimed:  Mathematical

15:48:29   1   algorithym, hedging, long economic practices, or like

15:48:35   2   intermediating dated settlement or abstract ideas.

15:48:37   3          Is the claim focused on, directed to that?  And,

15:48:43   4   Your Honor, the defendants respectfully have not gone

15:48:47   5   through the proper analysis.

15:48:49   6          So slide 6.  The step 1 is, what is the claim

15:48:56   7   directed to?  In Visual Memory, there are two decisions that

15:49:02   8   have come out since the briefing that I want to direct your

15:49:05   9   attention to.  One is Visual Memory, which reversed Your

15:49:08   10  Honor's decision finding ineligible and you can contrast

15:49:12   11  that with Two-Way Media, which affirmed.  Drawing a

15:49:16   12  distinction between looking carefully at those two opinions

15:49:20   13  I think should inform your analysis here.

15:49:23   14         In Visual Memory the Court said, the first step

15:49:28   15  requires Courts to determine whether the claims at issue are

15:49:30   16  directed to, are they directed to, focused on one of the

15:49:35   17  ineligible requirements?  In DDR Holdings, the question is,

15:49:41   18  is the claimed solution necessarily rooted in computer

15:49:43   19  technology in order to overcome a problem specifically

15:49:47   20  arising in the realm of computer networks?  If it is

15:49:55   21  addressed to a problem specific to computer networks or

15:49:59   22  computer technology, it is not abstract.

15:50:04   23         The question for Your Honor is:  Are these

15:50:06   24  claims aimed at a solution to a problem specifically arising

15:50:12   25  in the realm of computer technology or are they aimed at

15:50:16   1   what defendants say is the abstract idea, which you didn't

15:50:19   2   hear once today, responding to the spoken word.

15:50:25   3          Next slide, please.  Slide 7.

15:50:27   4          The Federal Circuit is clear that in order for

15:50:33   5   you to determine the claims to be invalid, you have to

15:50:37   6   identify, defendants have the burden of identifying the

15:50:41   7   abstract idea that the claims, all of them, are directed to,

15:50:47   8   focused on.  It's not enough that they underlie or that they

15:50:50   9   may relate to or involve, but they have to be focused on,

15:50:54  10   directed to the idea itself.

15:50:58  11          In their briefing, defendants identified that

15:51:00  12   idea as responding to spoken requests.  That is the burden

15:51:07  13   that they have to show you, which you didn't hear anything

15:51:11  14   about today, which is that these claims are not aimed at a

15:51:14  15   solution to a problem specific to the realm of computers or

15:51:20  16   technology, but rather to the idea of responding to spoken

15:51:26  17   requests written large, and if so, the claims would preempt

15:51:32  18   those, and they don't, as I will show you.  Instead, Your

15:51:36  19   Honor, I submit to you that these claims are aimed at

15:51:39  20   improved technology as individual memory, improved

15:51:43  21   technology for speech-based navigation of network-based

15:51:48  22   electronic data sources, and to multimodal methods for

15:51:54  23   resolving errors and ambiguities in doing so.  This is

15:51:58  24   specific to searching electronic databases.  Responding to

15:52:04  25   the spoken word has nothing to do outside of searching

15:52:08  1    electronic databases.

15:52:10  2             THE COURT:  Well, so if in 1999 I had gone into

15:52:16  3    a Blockbuster store, assuming they were still around at the

15:52:20  4    time, and asked for a Clint Eastwood movie, and they had

15:52:27  5    said, well, geez, there's more than one, do you want this

15:52:32  6    one, do you want that one, maybe I come in.  I'm speaking

15:52:36  7    with an accent, so I say Clint Eastwood movie, and they

15:52:40  8    think I'm talking about some other director's movie.  They

15:52:44  9    ask some questions.  But eventually -- and maybe I speak so

15:52:52  10   badly they say, well, can you write it down, because I can

15:52:59  11   actually write English, though I can't speak it very well.

15:53:02  12   Is not the same problem here?

15:53:04  13            MR. FENSTER:  It's not, Your Honor.  Slide 10,

15:53:07  14   please.

15:53:07  15            So the question is what the claims are directed

15:53:11  16   to, and it was long known that you can -- computers can

15:53:19  17   interpret, meaning they can take the acoustic signal of a

15:53:24  18   spoken word and translate that into text.  Okay.  That was

15:53:28  19   known.  It was similarly known how to search electronic

15:53:33  20   databases using structured query.  Defendants pointed that

15:53:36  21   out in the specification.  Okay.  That was also known.

15:53:40  22            The problem that was specific to this realm is:

15:53:47  23   How do you use a natural language query to query a

15:53:52  24   structured database that requires a structured query?

15:53:57  25   How do you bridge the gap between asking, is it raining in

15:54:01  1   New York today and querying an electronic data source that

15:54:09  2   requires only structured queries?  That is exactly the

15:54:14  3   technology that is claimed here, and the solution is a

15:54:19  4   specific one.

15:54:19  5        It is, first, take the -- so let's focus on

15:54:25  6   claim 1.  One is a method of speech based navigation of an

15:54:30  7   electronic data source.  That is the problem.  It is

15:54:33  8   specific to searching electronic data sources distributed

15:54:39  9   over a network located remotely from a user.  That's in the

15:54:43  10  claim language itself.

15:54:44  11       You receive the spoken request.  You render an

15:54:48  12  interpretation.  Rendering an interpretation is done with

15:54:52  13  conventional technology.  It is translating into text and

15:54:58  14  then parsing to determine in text.  Okay.

15:55:01  15       There are two different technologies that the

15:55:03  16  specification describes as performing that, rendering the

15:55:09  17  interpretation.  One is the natural language interpreter and

15:55:11  18  the second is the parser, to interpret the result, to

15:55:14  19  interpret the intent.  Okay.

15:55:17  20       Now, those were known.  What was not known is

15:55:21  21  how do you then get to a structured query for a structured

15:55:25  22  database?  And the innovation here then comes into

15:55:28  23  constructing the navigational query.  And, Your Honor, the

15:55:33  24  claim construction is important because the navigational

15:55:37  25  query here is a structured navigational query.  It is a

15:55:43  1  structured query specific to the type of data source being

15:55:48  2  searched.  It's not -- so the specification describes the

15:55:53  3  limitations of the prior art.

15:55:56  4      They said that prior voice driven systems were

15:55:59  5  not sufficient because they required you to know the

15:56:03  6  specific syntax of the language.  What they didn't allow you

15:56:07  7  to do was translate from receiving the spoken word into the

15:56:12  8  structured query.  You had to use the exact formulation or

15:56:16  9  it didn't work.  And that is what is -- that's the solution

15:56:22  10  is what is claimed, described in these patents and claimed

15:56:25  11  in these claims, and that is a technical solution, an

15:56:28  12  improved technology.  It's an improved interface for

15:56:31  13  searching electronic sources.

15:56:33  14      THE COURT:  Well, so you are saying the

15:56:40  15  technical solution.  Can you just tell me what the claims

15:56:42  16  say that technical solution is?

15:56:44  17      MR. FENSTER:  Yes.  The technical solution is

15:56:48  18  claimed here in claim 1, and it is the combination of the

15:56:51  19  following steps.  Okay.  It is taking the spoken request,

15:56:56  20  translating it into text, parsing it to determine intent,

15:57:01  21  selecting the appropriate data source, determining a

15:57:06  22  structured query, and then constructing the structured query

15:57:12  23  for that data source out of the text, then soliciting

15:57:18  24  additional information using a different mode of input

15:57:23  25  without requiring the user to request non-spoken modality.

15:57:29  1  Okay.

15:57:29  2          So this is happening.  One, it's an iterative

15:57:34  3  process.  You take the written, the spoken request, you

15:57:39  4  translate it, interpret it, select your database, construct

15:57:43  5  a query.  Then you have to solicit additional information to

15:57:48  6  refine the query based on information from a different

15:57:53  7  modality without the user saying, no.  Show it to me as

15:57:58  8  opposed to ask.  And that was specifically referenced in the

15:58:02  9  file history, getting to, is this preemptive?  This was

15:58:06  10  specifically referenced in the file history and discussed in

15:58:11  11  the file history to distinguish the prior art systems that

15:58:15  12  had voice driven systems, and I will show you that.

15:58:18  13          Refining the navigation query based on that

15:58:21  14  system, on the additional information.  This is a specific

15:58:25  15  iterative process, and what the innovation that they came up

15:58:29  16  with was figuring out that what we have to do is determine

15:58:32  17  the intent, to select the database, figure out the

15:58:38  18  structured query for that, and then construct a structured

15:58:41  19  query to search the electronic database, then refine it with

15:58:46  20  additional information.

15:58:48  21          That is different than the prior art.  It

15:58:52  22  overcame the problems that are described in Sections 1 and 2

15:58:57  23  of the '021 patent specification, and they are specifically

15:59:00  24  addressed in the file history.

15:59:03  25          Your Honor, I have to apologize.  We actually

15:59:08    1    cite -- we quoted from the file histories which are attached

15:59:14    2    to Exhibits 1 to 3 to my declaration, but we didn't cite to

15:59:17    3    them.  I apologize if that caused you problems.

15:59:21    4            THE COURT:  No, it didn't cause me any problems

15:59:23    5    yet.

15:59:23    6            MR. FENSTER:  Okay.  So this is Exhibit 1.  This

15:59:26    7    is for the '021 patent, and the '021 patent specifically,

15:59:37    8    there were two pieces of prior art that were cited.  One was

15:59:45    9    Levin.  Levin teaches a method of using at least one natural

15:59:50   10    language query to retrieve information from one or more data

15:59:54   11    resources and further performing a requested action using

15:59:59   12    the retrieved information.  Okay.  That was cited as a 102

16:00:05   13    or 103, 103 reference.

16:00:07   14            THE COURT:  Okay.

16:00:08   15            MR. FENSTER:  Okay.  That was combined with a

16:00:11   16    reference called French.  And, Your Honor, this is at

16:00:19   17    Exhibit 1 to my declaration at page 24.  The last one was at

16:00:24   18    page 23.

16:00:25   19            French teaches a management of speech and audio

16:00:28   20    prompts and interface in multimodal user interfaces.  And

16:00:32   21    the examiner combined French with Levin to come up with an

16:00:39   22    obviousness rejection.  There was no 102 rejection that was

16:00:43   23    cited, the specific combination of elements described in

16:00:47   24    claim 1 of the '021 patent.

16:00:51   25            One of the bases for distinguishing was that

16:01:03   1    the requirement that without -- without requiring the user

16:01:06   2    to request the non-spoken modality.  They relied on this

16:01:10   3    and the combination of elements to distinguish Levin and

16:01:13   4    French.  The examiner agreed, this claimed invention was

16:01:18   5    different than French and Levin, which were both

16:01:22   6    voice-driven systems.  Okay.  The point is that these are

16:01:27   7    not claiming response to spoken word or preempting that

16:01:32   8    field.  It was specifically distinguishing prior art that

16:01:38   9    claimed and described natural language queries.

16:01:43   10            In Exhibit 2 we have the '061 patent, and the

16:01:52   11   '061 patent distinguished a reference called Perrone.  This

16:02:01   12   is Exhibit 2, and this is Exhibit 2 at page 3.  Perrone

16:02:10   13   teaches a method for controlling a server using a voice.

16:02:14   14   This is in the '061 patent.  This is the one that has agents

16:02:17   15   and facilitators, which counsel described as merely

16:02:20   16   conventional, but that is what was used to distinguish the

16:02:31   17   Perrone reference.

16:02:33   18            And I will take you through the '061 and why the

16:02:36   19   agents, although agents were known, it's a specific

16:02:39   20   architecture that is claimed in the '061 that distinguished

16:02:43   21   Perrone and the other prior art and doesn't preempt the

16:02:46   22   field.  It is a specific type of architecture that has the

16:02:50   23   facilitator with agents registering to it, which is a

16:02:54   24   specific way to do it, and there are other ways to do it

16:02:58   25   that are not claimed and not covered by the '061 patent.

16:03:03    1           The claim, Exhibit 3, Your Honor, goes through

16:03:06    2    and is the file history for the '718 patent and further

16:03:12    3    distinguishes the Levin reference that we saw earlier.

16:03:21    4           If the problem is specifically rooted in

16:03:38    5    technology, it is not an abstract idea.  This problem is

16:03:44    6    specific to searching electronic databases.  This is not how

16:03:50    7    do you find the movie at Blockbuster.  This is how do you

16:03:54    8    query a remote electronic database using a voice-driven

16:03:58    9    front end?  It is specific to the technology, specific to

16:04:05   10    computer technology.  It only arises in that context, and

16:04:08   11    because of that, the inquiry failed at step 1.  They failed

16:04:14   12    to meet their burden at step 1.

16:04:26   13           Okay.  So we went through claim 21.  Claim 1 of

16:04:34   14    the '021 is representative of the independent claim 1 and

16:04:38   15    the corresponding claims, independent claims of the '021 and

16:04:43   16    the '718 that have the computer program method and system

16:04:49   17    claims.  There are three sets of claims that correspond.

16:04:53   18    Claim 1 is representative of that, and it claims the

16:04:56   19    specific combination of elements.  None of these elements

16:05:01   20    are new, but as in Visual Media, that doesn't matter, and

16:05:08   21    the reason is because we're not claiming a new -- a natural

16:05:11   22    language parsing system.  What we're claiming is a better

16:05:15   23    improved technology for searching an electronic data source

16:05:21   24    with a voice front end that has this combination of

16:05:25   25    elements, converting text into a structured query after you

16:05:28    1    determine what data source to use, and then further refining

16:05:33    2    in an iterative way using different modes without having to

16:05:37    3    ask the user to invoke those different modes.

16:05:41    4                Next slide.

16:05:42    5                So these are claim 3 and 4, dependent claims

16:05:47    6    3 and 4.  Counsel said that constructing a query doesn't

16:05:52    7    mean anything because there is no teaching about how that's

16:05:55    8    done.

16:05:55    9                First, that's not true.  The specification

16:05:58    10   specifically describes how you do that, and that is shown in

16:06:03    11   Figure 5, for example, of the '021 patent.  That specific

16:06:15    12   method is claimed specifically in claims 3 and 4.

16:06:21    13               So this is where constructing the navigation

16:06:24    14   query further includes the steps of extracting an input

16:06:28    15   template for an online scripted interface to the data source

16:06:34    16   and using the input template to construct the navigation

16:06:37    17   query.

16:06:37    18               Claim 3 is a very specific way of accomplishing

16:06:45    19   the constructing the query.  It is not preemptive of

16:06:49    20   responding to the spoken word.  There is no way that

16:06:55    21   defendants can argue that it is or that I submit Your Honor

16:06:59    22   could so find.  But that is what you would have to find in

16:07:02    23   order to invalidate this patent large on 101.

16:07:08    24               Claim 4 is dynamically scraping the scripted

16:07:11    25   interface in order to construct the query.

| 16:07:14 | 1 | So claims 3 and 4 have analog.  I don't agree |
| 16:07:18 | 2 | that claim 1 is representative of 3 and 4.  Three and 4 have |
| 16:07:23 | 3 | other claims that correspond, and I would agree that 3 and 4 |
| 16:07:26 | 4 | are representative of those. |
| 16:07:31 | 5 | The next slide, slide 12. |
| 16:07:38 | 6 | Six and 8 provide further meat on the bone. |
| 16:07:42 | 7 | Claim 8 is soliciting additional input is performed in |
| 16:07:48 | 8 | response to one or more deficiencies encountered during the |
| 16:07:51 | 9 | step of constructing the navigation query. |
| 16:07:55 | 10 | Your Honor, this is a specific method.  It |
| 16:07:58 | 11 | requires, first, you take the information.  You translate |
| 16:08:02 | 12 | it, parse it, identify the data source, construct a query. |
| 16:08:05 | 13 | Then you identify deficiencies in that query and then |
| 16:08:11 | 14 | solicit additional input using a different mode without |
| 16:08:14 | 15 | asking the user to invoke the different mode.  That's a |
| 16:08:18 | 16 | specific iterative method that happens to work really well |
| 16:08:23 | 17 | that these inventors, who are the inventors of Siri, I will |
| 16:08:27 | 18 | come back to that in a moment, invented back in 1999, and |
| 16:08:31 | 19 | that defendants, we submit, are now using.  There are other |
| 16:08:35 | 20 | ways to do it.  We don't have to use this method.  They're |
| 16:08:39 | 21 | going to argue that they don't.  They're going to argue that |
| 16:08:43 | 22 | they don't infringe contrary to their general argument that |
| 16:08:46 | 23 | these claims are preemptive of the whole field. |
| 16:08:50 | 24 | I want to call your attention -- |
| 16:08:52 | 25 | THE COURT:  I guess you're going to argue they |

16:08:53  1    do infringe.

16:08:55  2         MR. FENSTER:  These particular claims, yes.  I'm

16:08:57  3    not going to argue that there's no other way to do it or

16:08:59  4    that they cover all ways to do it and therefore they

16:09:02  5    infringe.  We're going to show you with their source code

16:09:04  6    and specific information specific to their products why they

16:09:09  7    meet this limitation.

16:09:10  8         I wanted to call your attention to -- the next

16:09:16  9    slide is 13, claims 15 through 23.

16:09:20  10        These are claims that are aimed at very specific

16:09:24  11   methods of refining the query through that multimodal

16:09:30  12   solicitation of additional information.  There are lots of

16:09:35  13   different ways to do it, but claims 15 through 23 provide

16:09:40  14   very specific detailed ways to accomplish that multimodal

16:09:48  15   refinement of the query, and we submit that claim 1, the

16:09:53  16   other claims, are not representative of these claims, that

16:09:56  17   these claims are representative of the corresponding claims

16:09:59  18   that have the corresponding limitations.

16:10:09  19        Claim 25 at page 14.  This one is important.

16:10:16  20   Further including the step of selecting the data source from

16:10:19  21   among a plurality of candidates in response to

16:10:22  22   interpretation of the spoken request.  Okay.

16:10:25  23        There are lots of systems, prior art systems,

16:10:31  24   that just add a front end voice driven system for accessing

16:10:36  25   a single electronic data source.  One of the important

16:10:41   1   **improvements of this technology was the ability to take the**

16:10:45   2   **interpretation and use it to select the appropriate data**

16:10:50   3   **source out of a plurality of data sources.  Are you asking**

16:10:53   4   **about the weather or are you asking about the score of last**

16:10:58   5   **night's baseball game or was it basketball, or are you**

16:11:02   6   **asking about the train schedule?  Those all require**

16:11:05   7   **searching different data sources.  One of the important**

16:11:09   8   **things that this technology, that this improvement**

16:11:12   9   **accomplished was the ability to discern from the**

16:11:17   10   **interpretation what data source should I use, because that**

16:11:23   11   **drives what structure query I need to construct, what the**

16:11:28   12   **system needs to construct automatically based on the**

16:11:32   13   **interpretation before refining it with additional**

16:11:35   14   **information.**

16:11:40   15   **Claim 72 is analogous to claim 1 except that it**

16:11:46   16   **specifically requires natural language spoken request.**

16:11:51   17   **Claim 1 is spoken request.  Part of, and claim 72 is**

16:11:56   18   **corresponding, but it's limited to natural language as**

16:11:59   19   **opposed to a spoken request.**

16:12:02   20   **Your Honor, I won't go through the '718.  Let me**

16:12:05   21   **just point to, take you to the '061 patent.  So this is**

16:12:12   22   **slide 19.**

16:12:17   23   **So, remember, your overarching inquiry is, is**

16:12:20   24   **this aimed at, directed to, does it claim all methods of**

16:12:26   25   **responding to a specific request, or is it more specific?**

16:12:30   1   Is it claiming a specific technical solution to a technical

16:12:34   2   problem rooted in technology?

16:12:35   3            So this is utilizing agents for speech-based

16:12:38   4   navigation of an electronic data source.  You have rendering

16:12:43   5   the interpretation, constructing a navigation query.

16:12:47   6   Everything I said about the claim 21 applies to that.

16:12:52   7            Routing the navigation query to at least one

16:12:55   8   agent.  Okay.  This is important because this implies an

16:13:01   9   architecture where you have multiple agents and you route

16:13:04   10  the query to one of several agents, and when you get to "E,"

16:13:09   11  it requires a facilitator that manages data flow among

16:13:14   12  multiple agents and maintains a registration of each agent's

16:13:19   13  capability.

16:13:23   14            So this is shown in Figure 6.  This is the

16:13:32   15  facilitator.  The facilitator has lots of agents that are

16:13:36   16  registered with it.  It has to maintain a registration of

16:13:42   17  the agents registered with it and their capability.  So when

16:13:49   18  the interpretation renders a request for weather, or a web

16:13:54   19  search or an e-mail or something else, the facilitator knows

16:14:00   20  how to do that.

16:14:01   21            Now, why is that important and how does this

16:14:03   22  distinguish over prior art?  Because this is a distributed

16:14:07   23  architecture as opposed to a flat architecture.  And in the

16:14:11   24  file history, they distinguished French, which was a flat

16:14:15   25  architecture.  Some of the prior art that we'll hear about

16:14:19   1   in this case as it goes forward is prior art that had

16:14:25   2   serial -- it didn't route to a particular agent.  It just

16:14:29   3   serially searches different databases until it comes up with

16:14:32   4   a result.  This claim requires an architecture that is

16:14:38   5   improved over that, because it allows the routing of the

16:14:43   6   query to the appropriate agent, the appropriate database

16:14:47   7   based on the interpretation, and it does that because it's

16:14:52   8   able to consult its registration of the agents and their

16:14:59   9   capabilities in doing so, and that is a claim limitation

16:15:03   10   specific to the claim, that it's in the architecture, and

16:15:05   11   that is different than responding to a spoken request.  It

16:15:09   12   is specific, it's a specific solution to a specific

16:15:14   13   technical problem.

16:15:14   14          THE COURT:  So you used the word or phrase,

16:15:17   15   distributed architecture.  Is the concept here that the

16:15:24   16   facilitator gets some kind of communication and then it has

16:15:29   17   all of these choices that it picks one according to some

16:15:32   18   rule or something?

16:15:33   19          MR. FENSTER:  That is essentially right.  So if

16:15:35   20   we go back to the claim, the claim has routing the

16:15:40   21   navigation query to an agent, invoking a user agent for

16:15:48   22   outputting the selected portion of the electronic data

16:15:51   23   source to the user, wherein a facilitator manages data flow

16:15:55   24   among multiple agents and maintains a registration of

16:16:03   25   agents' capabilities.  So that is right and that is what is

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 16:16:07 | 1  | reflected in the claim, as was shown in Figure 5 and                   |
| 16:16:10 | 2  | described in the specification as an improved technology.              |
| 16:16:15 | 3  | And --                                                                 |
| 16:16:16 | 4  | THE COURT:  And so you said as opposed to a flat                       |
| 16:16:20 | 5  | architecture.  Is that something where it just -- there's no           |
| 16:16:25 | 6  | kind of intelligent choice.  You just go through by brute              |
| 16:16:30 | 7  | force?                                                                 |
| 16:16:30 | 8  | MR. FENSTER:  That's right, Your Honor.  And                           |
| 16:16:32 | 9  | you'll hear in this case when we go through the development            |
| 16:16:37 | 10 | of the technology that led to these patents, the inventors            |
| 16:16:40 | 11 | of Siri went through a long development that led to these              |
| 16:16:46 | 12 | patents and part of that development was figuring out how do           |
| 16:16:49 | 13 | you construct the query.  Part of that development was                 |
| 16:16:53 | 14 | figuring out this architecture that is claimed and reflected           |
| 16:16:57 | 15 | in the '061 patent, because prior to this there was prior              |
| 16:17:02 | 16 | art that could take a spoken request and search multiple               |
| 16:17:12 | 17 | data sources, but it had no intelligence, no facilitator               |
| 16:17:17 | 18 | that had a registration of the capabilities in order to                |
| 16:17:20 | 19 | choose.  So it would just serially search.  It searches                |
| 16:17:23 | 20 | database 1, do I have an answer?  No.  Let's go to source               |
| 16:17:27 | 21 | 2, source 3, et cetera, and it didn't have the feedback                |
| 16:17:31 | 22 | system that is described in claim 4 of the '061 and others             |
| 16:17:36 | 23 | as well.                                                               |
| 16:17:37 | 24 | But this architecture was an important point,                          |
| 16:17:40 | 25 | and it's part of the history of the development that led to            |

16:17:45      1    the inventions that are claimed in these patents in 1999.

16:18:07      2            Counsel for Sony argued that, in connection with

16:18:13      3    the '061, none of this was new, that all of this was old,

16:18:18      4    that this combination of elements was conventional.

16:18:22      5            First, that's not the right inquiry at the 101

16:18:27      6    stage.

16:18:27      7            Second, that is entirely lawyer argument

16:18:29      8    unsupported by any evidence that it's inappropriate at the

16:18:37      9    12(b)(6) stage where you have to find that there's no set of

16:18:39     10    facts under which plaintiff can prevail, under which these

16:18:41     11    claims could be eligible under 101.  That's just not

16:18:47     12    sufficient to meet their burden under -- to prove these

16:18:50     13    patents invalid under 101.

16:18:53     14            What you heard is a lot of argument that each of

16:19:03     15    the elements in isolation were in the prior art.  What you

16:19:10     16    didn't hear or see is any evidence that shows that the

16:19:14     17    combination of elements, that the combination of figuring

16:19:19     18    out the structured query and then a multimodal iterative

16:19:24     19    process to improve that query to get the information, that

16:19:30     20    that combination of elements that are reflected in the claim

16:19:33     21    was conventional.  And, more importantly, they are aimed at

16:19:38     22    an improved technology that is specific to a -- that is

16:19:43     23    aimed at a problem that is specific to computer technology.

16:19:46     24    There is just no way around that, and that is step 1.  That

16:19:50     25    is your analysis of step 1.

16:19:54    1    Your Honor, I do want to commend you to go back

16:20:01    2    to the Visual Memory case, the Visual Memory case, and

16:20:06    3    compare that to Two-Way Media.  The Visual Memory case is

16:20:10    4    dispositive in this case and these claims are analogous, and

16:20:14    5    for the same reasons that the Federal Circuit found,

16:20:17    6    contrary to your initial determination, that the claims were

16:20:20    7    directed to an abstract idea in Visual Memory, these claims

16:20:27    8    are not aimed at, focused on, directed to, limited to the

16:20:32    9    abstract idea of responding to a spoken request.  They're

16:20:36   10    just not.  They are recited to and aimed at a specific

16:20:41   11    combination of elements that solves a problem that is

16:20:44   12    absolutely specifically and only rooted in technology.

16:20:50   13        THE COURT:  So a lot of the prior cases have

16:20:55   14    analogies of things like libraries, and so one of the things

16:20:59   15    that I'm trying to think about is that a lot -- it seems

16:21:14   16    like some of the prior cases at least involve putting things

16:21:20   17    on computers and networks and that sort of thing.

16:21:25   18        MR. FENSTER:  Yes.

16:21:28   19        THE COURT:  And so I'm trying to figure out what

16:21:30   20    the difference is between one that is rooted in computer

16:21:33   21    technology and one that is essentially a generic problem, if

16:21:40   22    you will, that you can have also on a computer.

16:21:45   23        MR. FENSTER:  Yes.

16:21:46   24        THE COURT:  And, in any event, so part of the

16:22:08   25    issue, or maybe not part of the issue, but one of the things

16:22:11   1   then is that, to some extent, I think in some of these other

16:22:16   2   cases, the Court, the Federal Circuit has been influenced

16:22:22   3   by the fact that the description in the claims of the method

16:22:27   4   or the system or whatever it might be is generic, and so

16:22:36   5   one of the things particularly in the independent claims

16:22:45   6   here is it seems awful generic.  And what's your response to

16:22:52   7   that?

16:22:52   8        MR. FENSTER:  All right.  So let me -- there are

16:23:00   9   two parts to that.

16:23:01   10        So the first is, when is the analogy to a

16:23:08   11   library or something else, something that you can do in the

16:23:12   12   human mind, when are those appropriate as opposed to when is

16:23:16   13   it specific to a computer technology?

16:23:19   14        THE COURT:  Right.  And in particular, and I

16:23:22   15   forget whether it's Bascom or Enfish, the self-referential

16:23:27   16   table, that had no possible analogy of something that

16:23:31   17   existed -- I mean, that only existed in a computer.

16:23:37   18        MR. FENSTER:  Well, so I agree that is what

16:23:42   19   the -- I agree with your last statement, but I don't agree

16:23:46   20   that there couldn't have been other analogies, and I'm sure

16:23:50   21   the defendants in that case argued that this is just like a

16:23:54   22   library --

16:23:55   23        THE COURT:  Maybe they did.

16:23:56   24        MR. FENSTER:  -- card that has, that self-refers

16:24:00   25   to something else.  So we've been doing this for years, and

16:24:04   1   the Federal Circuit said, no.  This is specific to computer

16:24:08   2   technology and what it is is an improved database.  Even

16:24:14   3   though there may be analogies in the real world, that's not

16:24:17   4   what the claim is about.  The claims in that case were about

16:24:21   5   an improved technology, an improved database.  In this case,

16:24:24   6   it's about an improved method for searching electronic data

16:24:29   7   source using a speech, a speech-driven system that has a

16:24:35   8   multimodal feedback for refining that.  That is to be

16:24:40   9   distinguished from cases like Bilski.  Okay.  So this was

16:24:49   10  the Hedging case.

16:24:51   11          So a lot of the cases that I think Your Honor's

16:24:54   12  first question went to are claims that invoked a computer,

16:25:01   13  but it wasn't improving the computer itself.  Right.  So

16:25:05   14  it's doing something that people have been doing forever,

16:25:08   15  but doing it faster because you use a computer.  Invalid.

16:25:12   16  Abstract.  Right.  But there wasn't an improvement in the

16:25:16   17  computer itself or in the functioning of the computer or how

16:25:18   18  it did that.  It was just saying, use a computer to do

16:25:22   19  something that we've always done, and that, the Federal

16:25:26   20  Circuit has held, the Supreme Court has held, is abstract.

16:25:30   21  That is to be distinguished from DDR, Enfish, Amdocs, Visual

16:25:38   22  Memory, Fales.  Okay.  All of these cases that say, that

16:25:43   23  found that the problem was specific to the technology

16:25:48   24  itself.  And here, it's not -- this isn't addressed to the

16:25:52   25  problem of, if you ask me a question as a person in my human

| 16:25:56 | 1 | mind, how do I respond to that, and it's not saying just do |
| 16:26:02 | 2 | it with a computer.  This is specific to the problem of, how |
| 16:26:06 | 3 | do you search a structured electronic database by asking it |
| 16:26:11 | 4 | a natural language question?  Well, you need a front end |
| 16:26:16 | 5 | system to do that, and the front end system takes the |
| 16:26:19 | 6 | language, converts it to text, parses it, selects the |
| 16:26:23 | 7 | database, finds a structured query form, populates that |
| 16:26:29 | 8 | structured query form, queries the database, and then |
| 16:26:34 | 9 | refines it using other modes to do that, and it's that |
| 16:26:39 | 10 | combination that was the winning combination back in 1999 |
| 16:26:46 | 11 | that was the solution to that problem. |
| 16:26:49 | 12 | So this is a difficult question, and I don't |
| 16:27:00 | 13 | know how to articulate it better than I have, and I'm sorry, |
| 16:27:04 | 14 | but what I can refer Your Honor to is compare Bilski and |
| 16:27:09 | 15 | Alice and that line of cases with Enfish.  Enfish has a |
| 16:27:16 | 16 | great discussion on this.  DDR was probably the first case |
| 16:27:21 | 17 | by the Federal Circuit to describe a technologically based |
| 16:27:26 | 18 | problem. |
| 16:27:27 | 19 | THE COURT:  Yes.  That's for sure. |
| 16:27:28 | 20 | MR. FENSTER:  Visual Memory has a very good, |
| 16:27:34 | 21 | very recent discussion on exactly this problem.  And I will |
| 16:27:39 | 22 | also refer Your Honor to Amdocs.  That has a good discussion |
| 16:27:43 | 23 | that's relevant to our case. |
| 16:27:44 | 24 | This problem is claimed, it's described in the |
| 16:27:51 | 25 | specification as specific to electronic database.  It is |

16:27:56   1   only because it's a structured electronics data source that

16:28:03   2   can only be queried in a structured query.  That's the

16:28:08   3   problem.  And it's, how do you interpret a natural language,

16:28:14   4   spoken request to do that?  That is the technological

16:28:17   5   problem rooted in that technology that is addressed by these

16:28:24   6   patents and claimed.

16:28:25   7           Now, to your second question, isn't this a

16:28:30   8   generic way to do it?  They seem kind of generic.

16:28:34   9           Can we go back to claim 1 of the '021.

16:28:38   10          So, Your Honor, it is not.  So there were prior

16:28:46   11  art systems that had natural language front ends or had

16:28:52   12  spoken word front ends, but they didn't have this

16:28:59   13  combination that allowed it to effectively do what this

16:29:03   14  invention does, and it's this combination of steps of

16:29:09   15  converting it to text, parsing it for intent, selecting the

16:29:13   16  data source, which gets you to a structured query.

16:29:17   17          Constructing the query under the construction

16:29:21   18  that is set forth in the specification itself is important,

16:29:26   19  because it's not any query.  It is a structured query

16:29:29   20  specific to that database that selects that data source.

16:29:34   21          THE COURT:  Well, maybe the question to ask is:

16:29:40   22  So how does a structured query distinguish from just a

16:29:49   23  query?

16:29:52   24          MR. FENSTER:  So a structured query is defined

16:29:54   25  in the specification and in our proposed claim construction

16:29:57    1    that corresponds directly as the structured query that is

16:30:02    2    appropriate for that data source.  Different data sources

16:30:07    3    have different structures.

16:30:08    4            THE COURT:  So the structured query is really

16:30:11    5    the right query?

16:30:12    6            MR. FENSTER:  No.  It is the structured query

16:30:18    7    that is dictated by the selected data source.  Okay.  So if

16:30:22    8    it's an SQL database, it may be an SQL query and it is

16:30:29    9    flexible in its approach, meaning it allows for the

16:30:34   10    selection of different data sources and the possibility that

16:30:38   11    different data sources may have different structures of

16:30:42   12    queries necessary, different forms, templates that have to

16:30:46   13    be populated to use, to query that data source, and the

16:30:51   14    specification describes that that is something that is

16:30:56   15    dictated by the data source itself.  But what is required is

16:31:02   16    to bridge the gap between the spoken language and the data

16:31:05   17    source is selecting the data source, recognizing that it has

16:31:09   18    a specific type of structure that you need to use,

16:31:14   19    populating that, and then it provides a mechanism to

16:31:19   20    recognize deficiencies in that query and how to resolve

16:31:23   21    that, and it provides very specific methods using multimodal

16:31:27   22    technologies and those methods described in claims 15 to 23

16:31:32   23    of the '021 patent to resolve those ambiguities.

16:31:36   24            It's a specific way to do it.  It may be broad,

16:31:42   25    but it is not preemptive, and if it is so broad as

16:31:47    1    **defendants say, then they'll have lots of prior art and be**

16:31:50    2    **able to prove that it's invalid under 102 or 103.  But 101**

16:31:55    3    **is not a proxy for that analysis.  These cases should go**

16:32:00    4    **forward.  They have not met their burden under step 1 or**

16:32:02    5    **step 2 of the 101 analysis.**

16:32:04    6    **THE COURT:  All right.  Thank you, Mr. Fenster.**

16:32:07    7    **MR. FENSTER:  Thank you, Your Honor.**

16:32:08    8    **THE COURT:  All right.  Not too much, but I**

16:32:10    9    **assume there's probably a desire to reply to some of this?**

16:32:14   10    **MR. HADDEN:  If I could, Your Honor?**

16:32:15   11    **THE COURT:  Sure.**

16:32:16   12    **MR. HADDEN:  So I'm pulling up this slide.  Let**

16:32:27   13    **me respond briefly to Your Honor's question and a sort of**

16:32:33   14    **general description of the 101 law, because I think there**

16:32:35   15    **are actually sort of two paths to 101.  There's clearly**

16:32:40   16    **the Bilski line of cases, Amazon OIP, where the issue is**

16:32:44   17    **just, are you taking a standard brick and mortar business**

16:32:49   18    **practice and putting go it online.  Those cases are clearly**

16:32:52   19    **invalid.**

16:32:52   20    **THE COURT:  Yes.  We're not talking business**

16:32:54   21    **practice here.**

16:32:55   22    **MR. HADDEN:  We're not talking that.  There's**

16:32:56   23    **another line of cases though, and it goes back to our first**

16:33:00   24    **quote.  Two-Way Media, which is, there are also cases that**

16:33:06   25    **are abstract because they're claiming a result and not a**

16:33:11    1    specific solution.   That's Affinity Labs, Two-Way Media,

16:33:18    2    TLI, all of those cases.

16:33:20    3            Now, there is not a get out free card from 101

16:33:24    4    because your claims are about digital information or

16:33:26    5    computers.  Right.  Two-Way Media was about a network,

16:33:32    6    multicasting, streaming system.  It was rooted in computer

16:33:36    7    technology.  But the Federal Circuit found it was invalid

16:33:40    8    because it wasn't claiming a specific solution.  It was

16:33:43    9    claiming a result.  The same thing in Affinity Labs.  Right.

16:33:48    10   It was about streaming digital information to a handheld

16:33:51    11   device.  That is rooted in computer technology.  It's still

16:33:56    12   invalid because it didn't claim a specific way to do it.  It

16:33:59    13   claimed a result.

16:34:00    14           THE COURT:  So claiming a result of a 101

16:34:08    15   problem, when you claim a result, what does the Court say

16:34:15    16   you should say of the abstract idea?

16:34:18    17           MR. FENSTER:  The abstract idea is the result.

16:34:20    18   Right.  Here it is responding to a spoken request.  All

16:34:25    19   right.  In TLI, it was providing information to a portable

16:34:30    20   device.  Not TLI.  Sorry, Your Honor.  Affinity Labs.  TLI,

16:34:36    21   I forgot the exact articulation, but it was basically the

16:34:39    22   ability to upload and categorize digital images on a server.

16:34:45    23   Right.

16:34:45    24           All of those things are rooted in technology and

16:34:48    25   computers, but they're not providing an improvement to

16:34:53  1  computer technology.  They're just claiming a result that is

16:34:56  2  obtained using computers or networks or other things, and

16:35:00  3  that's what's happening here.

16:35:02  4  The other kind of issue that we heard for the

16:35:05  5  first time really, which was not in their brief, was what

16:35:08  6  was that the specific technical solution here is taking a

16:35:14  7  query that is formulated in a natural language and

16:35:18  8  converting it to a structured query.  But there is nothing

16:35:23  9  in this claim that provides a solution for doing that.

16:35:27  10  So if we look at the slide we have up, as Your

16:35:30  11  Honor pointed out, right, a navigation query under their

16:35:33  12  construction is a query that works.  There's nothing that

16:35:37  13  tells you how to construct that query that will work.

16:35:40  14  There's nothing in this claim that tells you how to select

16:35:44  15  the appropriate database for which you will then construct

16:35:48  16  the appropriate query.  It just said creating, using.

16:35:55  17  Right.  Saying, do the right thing to get the information

16:35:59  18  the user wants with no method or algorithym or steps or

16:36:04  19  solution for figuring out how that is and how to do it.

16:36:14  20  And we go back to the Clint Eastwood example and

16:36:17  21  Your Honor's video store.  There's no distinction.  Right.

16:36:19  22  The same steps in this claim could be performed with the

16:36:24  23  clerk at the video store, and there's no more detail in this

16:36:27  24  claim as to how a computer can solve the problems that are

16:36:30  25  required.  For example, identifying what the specific

16:36:34   1   database is, identifying what the format of a structured

16:36:37   2   query would need to look like for that database.   Somehow

16:36:42   3   creating that structured query from the meaning of the words

16:36:45   4   that were obtained from the user.   None of that is described

16:36:49   5   in this claim.

16:36:50   6        In addition, soliciting the additional input,

16:36:53   7   there's no description on how the system determines

16:36:56   8   additional input is needed, how that additional input could

16:37:01   9   be used in this structured query that has to be created, or

16:37:04   10   anything else.   Right.   All this claim does is our Clint

16:37:10   11   Eastwood walk through.   Right.   I want this.   Here are some

16:37:13   12   options.   Pick one.   You get what you want.   That's why this

16:37:18   13   claim is abstract.   It claims nothing but the idea for that

16:37:21   14   interaction.   It leaves it to someone else to figure out all

16:37:25   15   the hard stuff, like, what is the right structured query,

16:37:27   16   what is the right database, how would you find it, how would

16:37:31   17   you do this magic conversion from natural language to a

16:37:34   18   structured query?   It's just not there.

16:37:36   19        THE COURT:   So the claim, one of these dependent

16:37:40   20   claims Mr. Fenster showed, it talks about --

16:37:44   21        MR. HADDEN:   Creating a template or something?

16:37:46   22        THE COURT:   Yes.

16:37:46   23        MR. HADDEN:   First off, Your Honor, none of that

16:37:48   24   was raised in their brief.

16:37:49   25        THE COURT:   Well, yes, I didn't see it in the

16:37:53  1    brief either, but that's part of the reason why we have

16:37:57  2    argument, to flesh out or you talk about a smoke out.  You

16:38:02  3    know, what everybody's positions are.  I'm sure you have a

16:38:11  4    response.

16:38:12  5              To the extent the -- I was just going to say, it

16:38:22  6    may be that if the briefing is all about claim 1, maybe

16:38:30  7    we'll address claim 1, but if it goes badly for the

16:38:35  8    plaintiff, then we'll have another round where we address

16:38:38  9    claim 3 and 4.  I mean --

16:38:42  10             MR. HADDEN:  We can do that.  Those claims

16:38:43  11   weren't asserted.  They were never raised in the brief.  I

16:38:46  12   can respond off the cuff, but I'm not sure it's going to be

16:38:48  13   complete.

16:38:49  14             But to follow up what's on the screen, it says,

16:38:53  15   basically, you find some template that works and you adapt

16:38:56  16   it based on the natural, the meaning of what was said.  That

16:39:01  17   again is not solution.  It doesn't tell you how to find the

16:39:05  18   template.  It doesn't tell you what the template is.  It

16:39:07  19   doesn't tell you how you go from the meaning of the words

16:39:11  20   that were spoken to some structure that would be appropriate

16:39:14  21   for a particular database.  It adds maybe a little gloss,

16:39:20  22   but it says nothing about how you would actually do this and

16:39:25  23   whether it would be a solution.

16:39:26  24             But if they're going to hang their hat on claim

16:39:30  25   3 or 4, we're happy to address it, but those aren't asserted

16:39:35   1   and have nothing to do with the case.

16:39:37   2            THE COURT:  You say they aren't asserted, but I

16:39:40   3   thought I heard Mr. Fenster say they had the claims to

16:39:42   4   assert it.

16:39:43   5            MR. HADDEN:  They identified claims in their

16:39:44   6   complaint.

16:39:45   7            THE COURT:  Oh.

16:39:45   8            MR. HADDEN:  And we addressed those claims.

16:39:47   9            THE COURT:  Okay.  But that does not really

16:39:50  10   limit them.

16:39:51  11            MR. HADDEN:  Understood, Your Honor.  I saw no

16:39:53  12   there, there.  If you would like me to address it's in more

16:39:56  13   detail, I'm happy to do it.

16:39:58  14            THE COURT:  All right.  It wouldn't be the first

16:39:59  15   thing that we're going to do here.

16:40:01  16            Okay.  Do you have anything else, Mr. Hadden?

16:40:03  17            MR. HADDEN:  Unless Your Honor has questions, I

16:40:05  18   will give my colleague a shot.

16:40:06  19            THE COURT:  No.  I will give your colleague a

16:40:08  20   shot, too.

16:40:09  21            MR. HENDERSHOT:  I appreciate it, Your Honor.

16:40:13  22            Bring up slide 12.

16:40:18  23            So with respect to the structured query that

16:40:24  24   they talked about, they talked about using conventional

16:40:26  25   technology, conventional technology.  They talk about,

16:40:29  1  really, it's about the structured query.

16:40:34  2       These are their constructions of a navigation

16:40:36  3  query.  And if you look at the specification, the second

16:40:41  4  quote, it says, practitioners of ordinary skill in the art

16:40:45  5  will be thoroughly familiar with the notion of database

16:40:48  6  navigation through structured query.  So they're familiar

16:40:51  7  with that, which I believe he conceded, but not just the

16:40:54  8  idea that you can do it.

16:40:56  9       It continues and says, those practitioners will

16:40:58  10  be readily able to appreciate and utilize the existing data

16:41:02  11  structures and navigational mechanisms for a given database,

16:41:06  12  and this is the key point, the last bit.  Or to create such

16:41:09  13  structures and mechanisms where desired.

16:41:12  14       So it is fully within those of skill in the art

16:41:14  15  to create the structured query.  I'm not arguing 102 or 103

16:41:19  16  right now.  This is the specification, which is properly in

16:41:21  17  the record under a Rule 12 motion, copying what he just said

16:41:25  18  the invention as conventional.  That's their own

16:41:29  19  specification.  That's not attorney argument.  That's not me

16:41:31  20  trying to characterize some things.  That is their

16:41:33  21  specification.  And they said what he said the invention is

16:41:35  22  was conventional and something of a person of ordinary skill

16:41:38  23  in the art was readily able to implement.

16:41:41  24       With respect to claims 3 and 4 and scraping a

16:41:45  25  template, again, those were not in the brief, but I would

16:41:48  1  point the Court's attention to in the '061 patent, column 9.

16:41:54  2  I will begin reading from line 36.  It says, in many

16:41:58  3  existing Internet and Intranet applications, an online data

16:42:02  4  source is accessible to users only through the medium of an

16:42:07  5  interaction with so-called common gateway interface script,

16:42:09  6  or a CGI script, which is what he was talking about

16:42:12  7  scraping.  That was ubiquitous technology in the Internet

16:42:15  8  then and now.

16:42:16  9       The patent continues to discuss this CGI script,

16:42:19  10  which was ubiquitous and acknowledged in the patent as

16:42:23  11  standard.

16:42:24  12       In column 10, beginning at line 6, in the

16:42:29  13  embodiment just described, scraping step, which is scraping

16:42:32  14  that template, is preferably carried out with the assistance

16:42:36  15  of an online extraction utility, such as WebL.  That's

16:42:42  16  capital W-e-b-L.

16:42:46  17       And it says WebL is a scripting language and

16:42:49  18  continues on, describing its capabilities, and the complete

16:42:54  19  source code for WebL is available from Compaq.  This is

16:42:59  20  off-the-shelf software that they are talking about using.

16:43:02  21  It was ubiquitous at the time.  The specification or the

16:43:05  22  points he's talking about in these claims at a minimum are

16:43:08  23  talking about using purely conventional and off-the-shelf

16:43:10  24  software.  That's not me arguing that.  That's the language

16:43:13  25  of the specification.

16:43:14    1          There was some discussion of 101 not being a

16:43:19    2    proxy for 102 or 112.  I agree.  I'm not arguing 102 or 13.

16:43:25    3    I think they will have 112 problems down the pike if we get

16:43:29    4    there.  But we focused on the claims and admissions in the

16:43:32    5    specification demonstrating they are conventional.

16:43:34    6          The addition of computing technology that is

16:43:36    7    conventional, as admitted in the specification, doesn't

16:43:39    8    transmit a claim in Alice step 2.  That's why we focused on

16:43:43    9    that.  I'm not arguing 102 or 103 here, but counsel laid out

16:43:48   10    file histories and argued 102 and 103 in connection with the

16:43:53   11    file histories to argue that these claims aren't preemptive

16:43:56   12    because they distinguished over prior art.

16:43:58   13          When these patents were prosecuted, State Street

16:44:02   14    Bank was the law of the land.  You could patent anything

16:44:04   15    under the sun made by man.  So it was years before Bilski,

16:44:08   16    years before Alice.

16:44:09   17          THE COURT:  I didn't think he was doing that to

16:44:11   18    say there had already been some kind of ruling on 101.

16:44:17   19          MR. HENDERSHOT:  Yes.  I would say the law is

16:44:20   20    developed since then and the fact that they overcame a 102

16:44:24   21    or 103 objection I don't think is relevant to 101.

16:44:28   22          In Two-Way Media, Federal Circuit recently

16:44:32   23    stated --

16:44:33   24          THE COURT:  I know what they said.

16:44:34   25          MR. HENDERSHOT:  All right.  And they also said

16:44:36   1   complete preemption is not required, I'm sure Your Honor is

16:44:39   2   familiar with, and the Cramps analysis, Alice Step 1 and

16:44:41   3   Step 2, which we've addressed.

16:44:42   4          And just to circle back briefly, these claims

16:44:48   5   involve computers.  There's no question they recite

16:44:50   6   conventional generic computing technology.  But Your Honor

16:44:54   7   is talking about a brick and mortar example of a library,

16:44:57   8   and we laid out a couple of those examples in our briefing.

16:45:00   9          THE COURT:  Yes.  I can't remember.  I read so

16:45:02   10  many of these briefs, there are so many analogies, and

16:45:08   11  people like to use the same analogies, so I get them all

16:45:11   12  confused.

16:45:11   13         MR. HENDERSHOT:  I did a law firm's files

16:45:13   14  because it's near and dear to my heart, but I can go with

16:45:17   15  the library you talked about.

16:45:18   16         If I go to a librarian and I want to find a

16:45:20   17  Law Review article from, say, Judge Learned Hand wrote one.

16:45:27   18  I can't name one off the top of my head.  I apologize.  I

16:45:30   19  will ask for help in the library because I'm not going to be

16:45:33   20  able to find that myself, make an oral request.  Hey, I'm

16:45:36   21  looking for a Law Review article by Judge Hand.  The

16:45:39   22  librarian is going to render an interpretation of that.  If

16:45:42   23  that's not enough information, she's going to ask me for

16:45:45   24  more.  Maybe there's a form that I need to fill out.  Maybe

16:45:48   25  multiple forms.  Maybe one for microfiche.  Maybe one for

16:45:53     1   just getting a book off the shelves, a research request.

16:45:55     2   Those are structured queries at the level they're talking

16:45:58     3   about.

16:45:59     4           And all of the claims, all of the elements in

16:46:01     5   these claims map to that kind of example.  If I have to do a

16:46:05     6   non-spoken modality and fill out, this is the title of the

16:46:09     7   article, or this is where I think it was published, that is

16:46:12     8   an interaction that maps to these claims.  And I say that

16:46:17     9   not because this is a business method that was done off the

16:46:20    10   Internet that they're trying to put on the Internet.  I'm

16:46:22    11   not invoking that line of cases, but what it's illustrative

16:46:27    12   of is that they are claiming these desired results at such a

16:46:32    13   high functional level that's fundamental to processing the

16:46:34    14   spoken request, they still map to brick and mortar examples

16:46:37    15   as we laid out in our briefing.

16:46:40    16           So it is the fact these claims are claiming

16:46:47    17   things in results oriented language, desired functions they

16:46:51    18   want to achieve, I don't have a specific way of getting them

16:46:54    19   done.  That's why I'm asking for a brick and mortar example,

16:46:58    20   and those, each of those steps in those functions are

16:47:03    21   fundamental to the abstract idea identified in the briefing,

16:47:06    22   which was responding to a spoken request for information.

16:47:09    23   We've laid that out in our briefing.  I won't burden you

16:47:12    24   with more argument now on it.  That covers what I have.

16:47:18    25           THE COURT:  All right.  Mr. Fenster, I detect

16:47:22   1   that you would like to respond.

16:47:23   2              MR. FENSTER:  Your Honor, I will keep it very

16:47:26   3   brief.  Two-Way Media and Visual Memory.  I commend you to

16:47:35   4   read these two decisions.

16:47:37   5              THE COURT:  Right.  You said that at least once

16:47:39   6   already.

16:47:39   7              MR. FENSTER:  So in response to what Mr. Hadden

16:47:44   8   just said.  So the difference is in Visual Memory, there was

16:47:47   9   an improved technology, and in Two-Way Media, there was no

16:47:51   10  improvement in technology.  It did involve streaming, but it

16:47:54   11  didn't involve any technology, an improvement in technology,

16:47:59   12  and that was the difference between Two-Way Media and Visual

16:48:03   13  Memory.

16:48:04   14             Here, there is an improved technology, and that

16:48:07   15  is the ordered combination.  This combination of elements is

16:48:14   16  not old or conventional, and neither of the defendants can

16:48:19   17  point to anything in the specification that says, this

16:48:23   18  ordered combination is old.  It's conventional.  Instead,

16:48:28   19  they point to individual elements in isolation.  That goes

16:48:34   20  to enablement, not to the overall concept and whether these

16:48:39   21  were put together in an unconventional way, and if they were

16:48:42   22  so conventional, then they will have 102 art for Your Honor,

16:48:46   23  and they don't.

16:48:49   24             THE COURT:  The argument I think Mr. Hadden

16:48:53   25  made, I'm not sure I actually heard made quite the same way

| | | |
|---|---|---|
| 16:48:57 | 1 | before, which I think I should fairly summarize as being, |
| 16:49:09 | 2 | patents are abstract when they just claim the results.  What |
| 16:49:13 | 3 | about that? |
| 16:49:14 | 4 | MR. FENSTER:  These don't claim the result. |
| 16:49:17 | 5 | They claim a series of steps to get there, and that |
| 16:49:23 | 6 | argument, that very argument is specifically addressed at |
| 16:49:25 | 7 | pages 12 to 15 of the Visual Memory case.  And, Your Honor, |
| 16:49:34 | 8 | they go through and say that analysis is wrong at the 101 |
| 16:49:38 | 9 | level.  It goes to enablement.  Read pages 12 to 15 of the |
| 16:49:44 | 10 | Visual Memory case in light of Mr. Hadden's argument.  It |
| 16:49:47 | 11 | addresses exactly that. |
| 16:49:49 | 12 | THE COURT:  Okay.  Thank you. |
| 16:49:51 | 13 | MR. FENSTER:  Thank you, Your Honor. |
| 16:49:52 | 14 | THE COURT:  All right.  I will take this under |
| 16:50:00 | 15 | advisement and in due course will issue some opinion. |
| 16:50:17 | 16 | And is there anything further that I can help |
| 16:50:19 | 17 | you with today? |
| 16:50:20 | 18 | MR. FENSTER:  No, Your Honor. |
| 16:50:20 | 19 | MR. HADDEN:  No, Your Honor. |
| 16:50:22 | 20 | MR. HENDERSHOT:  No, Your Honor. |
| 16:50:22 | 21 | THE COURT:  All right.  Well, thank you very |
| 16:50:24 | 22 | much for your time.  We'll be in recess. |
| 16:50:35 | 23 | (Hearing concluded at 5:00 p.m. ) |
| 16:50:35 | 24 | -  -  - |
| | 25 | |